motion would itself most certainly be problematic.

Finally, Mr. Parsky argues that he should be permitted to intervene here, notwithstanding the passage of time, because the Defendant will "suffer no undue prejudice," having been "on notice" of Mr. Parsky's role as "central member of the Simon Group" and his interests in this litigation at least since its inception in 1993. Mem. in Supp. of Mot. to Intervene, at p. 15, 18. In support of his contention that notice is central to the question of whether intervention is appropriate here, Mr. Parsky cites again to *Snoqualmie Tribe,* 178 Ct.Cl. at 587, 372 F.2d 951 ("[T]he inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading.").

Here again, Mr. Parsky attempts to import a Rule 15 concept into his Rule 24 Motion to Intervene. The statute of limitations period provided for in 28 U.S.C. § 2501, is a strict six years. While notice may be a factor in some courts, in the Court of Federal Claims neither notice nor considerations of prejudice can create or enlarge the waiver of sovereign immunity. *See United States v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (the Supreme Court stated that "we should not take it upon ourselves to extend the waiver beyond that which Congress intended.").

Consequently, we find that Mr. Parsky's proposed Complaint–in–Intervention does not relate back to the Plaintiffs' timely filed complaint.

## IV. Conclusion

This Court has now considered and rejected Mr. Parsky's efforts to participate in this litigation founded on motions involving Rules 8, 12, 15, 17, 24, 41, 42, 59, and 83. In short, Mr. Parsky's failure is not for counsel's lack of skilled and persistent advocacy. While we will resist the temptation to dismiss Mr. Parsky's latest effort in the same words the Lord Protector dismissed the Rump Parliament in 1653, we believe that he certainly has had his day in this Court.

For the foregoing reasons, **we DENY proposed Plaintiff intervenor Gerald L. Parsky's Motion to Intervene.** The Clerk of Court is directed to return to Mr. Parsky the original of his proposed Complaint–in–Intervention. Each party to bear its own costs.

**IT IS SO ORDERED.**

**Paul J. SCARSETH, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 99–52C.

United States Court of Federal Claims.

April 30, 2002.

Edward A. Zimmerman, Burnsville, MN, attorney of record for the plaintiff.

David Hoffman, Commercial Litigation Branch, Civil Division, Department of Justice, James M. Kinsella, Deputy Director and David M. Cohen, Director, Commercial Litigation Branch, for the defendant. Major James R. Agar II and Captain Arden B. Levy, United States Army Legal Services Agency, Arlington, VA, of counsel.

## OPINION

HORN, Judge.

Plaintiff, Paul J. Scarseth, a former United States Army Reserve officer, brought this action seeking relief in the form of voiding his discharge from the military, reinstatement with back pay, and a disability retirement. The defendant filed an earlier motion to dismiss on August 2, 1999, arguing that plaintiff had cited no money mandating statute on which to base jurisdiction in this court and failure to state a claim on which relief may be granted. The court denied defendant's motion to dismiss. The court held that plaintiff could claim back pay under 37 U.S.C. § 204, a money-mandating statute, *Scarseth v. United States*, 46 Fed.Cl. 406, 410–12 (2000), and that, therefore, the court had jurisdiction to resolve plaintiff's claim. *See id.* at 411. The court further held that plaintiff had raised justiciable issues, including whether the Army failed to follow its own regulations and whether plaintiff's resignation was voluntary. *See id.* at 413. Subsequent to issuing its first opinion in this case, on March 27, 2000, the court granted the plaintiff's motion to amend the complaint. The case is now before the court on another motion by defendant to dismiss for lack of jurisdiction, based on defendant's contention that the plaintiff voluntarily resigned from the United States Army Reserve. Defendant asserts that plaintiff's voluntary resignation bars jurisdiction in this court to adjudicate plaintiff's claims for reinstatement and back pay. Defendant further argues that plaintiff's claim for disability is not ripe for review, as plaintiff has failed to exhaust required administrative remedies.

After a thorough review of the record before the court and of the applicable law, the court concludes that plaintiff's resignation was, in fact, voluntary. This court, therefore, does not possess jurisdiction to hear plaintiff's case. Accordingly, defendant's motion to dismiss for lack of subject matter jurisdiction is granted. Alternatively, based on a review of the record, defendant's motion for judgment on the administrative record is granted.

## FINDINGS OF FACT

The plaintiff, Paul J. Scarseth, joined the Army National Guard in 1981, and the United States Army Reserve Officer Training Program in 1983. Mr. Scarseth was commissioned in the United States Army Reserve in 1984. In 1987, he joined the 400th Military Police (MP) Prisoner of War (POW)[1] unit stationed at Tallahassee, Florida. In 1990, Captain Scarseth moved from Tallahassee, Florida to Hastings, Minnesota. Pursuant to a request from Captain Scarseth, the Army's Unit Administrator changed his home of record to Hastings, Minnesota in his official files. Captain Scarseth, however, continued to attend monthly drills with the 400th MP unit in Florida until April, 1992.

Captain Scarseth's unit was activated in January of 1991. In February of 1991, plaintiff Scarseth's Florida unit was deployed to the Persian Gulf War and operated in Saudi Arabia during a six-month deployment until June, 1991. Plaintiff Scarseth states that while on deployment, he suffered aggravation of his previously existing condition due to exposure to noxious fumes. Plaintiff Scarseth contends that he has a severe respiratory condition, and suffers from post-traumatic stress disorder and depression.

After returning from the Persian Gulf War on July 1, 1991, Captain Scarseth was discharged from the Army Reserve with an Honorable Discharge, but, according to the plaintiff, he continued to serve as a reservist in the United States Army Reserve (USAR) with his Florida unit until April, 1992. In the summer of 1991, subsequent to his Hon-

---

1. The designation of the 400th MP unit subse- quently was changed to the 724th MP Battalion.

orable Discharge from the Army Reserve, Captain Scarseth alleges that he was told by his Unit Administrator that he could not claim Minnesota as his home of record because he would be living and reporting as a reservist in Florida. Mr. Scarseth stated that he stayed with his brother in Gainesville, Florida when he was not living and reporting as a reservist in Tallahassee, Florida.

In March 1992, the Army Criminal Investigation Division (CID) investigated allegations that Captain Scarseth had obtained travel payments to which he was not entitled by submitting vouchers which contained false information, focusing on periods of travel during December, 1990 and July through October, 1991. The CID investigation concluded that Captain Scarseth had submitted fraudulent vouchers for unauthorized travel expenses and per diem. The investigation also concluded that Captain Scarseth had submitted forged rent receipts with his vouchers. The CID investigation report included an evaluation from a voucher examiner stating: "TDY travel vouchers within TDY travel vouchers; travel vouchers without authorization to take travel; dual lodging receipts, without orders authorizing dual lodging; and received dual per diem and lodging that was unauthorized." The criminal investigation report contained in the administrative record details that plaintiff acknowledged to investigators that he was living and reporting for reserve duty in Tallahassee, Florida, and claiming travel pay from other locations. The criminal investigation also concludes that plaintiff had asked Mr. Gardner, his landlord, to change his previous statement to investigators that plaintiff paid him small amounts in rent, to state instead that plaintiff paid $4,000.00 in rent and that Mr. Gardner had signed rent receipts which in fact he had not signed. Mr. Gardner, however, responded that he "would not lie for him [plaintiff]."

In March, 1992, CID computed that plaintiff owed the government for false travel vouchers. Subsequently, in December, 1992, the Defense Finance and Accounting Service (DFAS) or finance office assessed the travel voucher debt against Captain Scarseth. Although Captain Scarseth contested the over-payment, he agreed to repay the indebtedness by drilling with a Reserve unit and allotting $199.04 from each monthly paycheck to the government. Captain Scarseth owed just under $400.00 of the debt by February, 1994. Plaintiff alleges at that time he became too ill to continue drilling with the Reserve Unit. According to the plaintiff, before Captain Scarseth could recover and make the final payments, his former commander preferred court-martial charges against him, and he was ordered to Fort McPherson, Georgia in February, 1994, to appear at an investigation pursuant to Article 32 of the Uniform Code of Military Justice, 10 U.S.C. § 832 (1994).

Captain Kevin Govern was assigned to provide legal advice to Captain Scarseth. Captain Govern initially advised plaintiff through written memoranda and in telephone conversations, but later also met with the plaintiff on several occasions. Beginning in October, 1993, plaintiff provided documents to Captain Govern, for review and for preparation of his defense.

Captain Jeffrey Arnold, the government trial counsel, concluded, in a November 10, 1993, memorandum to the Staff Judge Advocate for the United States Army Reserve Command, that the Army had evidence sufficient to charge the plaintiff with submission of "false vouchers and receipts" and obstruction of justice. On December 11, 1993, formal charges were preferred against Captain Scarseth by his commander, Lieutenant Colonel Michael Klages. Plaintiff was charged with the submission of false travel vouchers, forgery, and attempting to impede a criminal investigation. The criminal charge sheet, dated December 11, 1993, charged plaintiff Scarseth with the submission of false and fraudulent travel vouchers for travel and per diem pay, and thereby that the plaintiff did "steal money, military property, of a value of over $100.00 . . . ." Plaintiff also was charged with impeding an investigation on April 4, 1992, by asking a witness, Mr. Felix Gardner, to make a false statement to investigators. The charges indicated that plaintiff had claimed as his residence his brother's residence in Gainesville, Florida, but that plaintiff was residing in Tallahassee,

Florida, while drawing travel and per diem pay from Gainesville, Florida and also from his former home in Hastings, Minnesota.

After working with Captain Scarseth, Captain Govern counseled plaintiff to submit his resignation in lieu of court-martial. Subsequently, Captain Scarseth wrote an undated letter to Captain Govern, indicating his desire to resign his commission in lieu of court-martial. Captain Govern replied in a January 4, 1994, memorandum, indicating his opinion that the Reserve Forces Command would be amenable to a resignation in lieu of court-martial. In the memorandum, Captain Govern advised Captain Scarseth how to proceed in order to submit his resignation.

On January 25, 1994, Captain Scarseth was ordered to active duty, involuntarily, for purposes of an Article 32 investigation of the court-martial charges. Plaintiff was ordered to report to Fort McPherson by February 14, 1994.

In a February 1, 1994, memorandum to Captain Govern, his counsel, Captain Scarseth wrote thanking counsel for a January 31, 1994, telephone call, and indicating that he wanted to resign from the USAR. In the memorandum, Captain Scarseth indicated that he understood that submitting his resignation with appropriate documentation as to his medical conditions and other circumstances was in the best interest of the Army and himself. Plaintiff suggests in the memorandum that his medical condition, repayment of the debt he owed the Army, and volunteer efforts working for his unit should be considered mitigating factors to be incorporated in his defense. Captain Scarseth also indicated in the memorandum that if there was a chance of retaining his commission he would prefer to do so. The memorandum also stated that with the memorandum, plaintiff was enclosing a letter of resignation dated February 1, 1994. The February 1, 1994 letter of resignation was never produced to the court by either party to the lawsuit currently before the court.

Some time after arriving at Fort McPherson on February 14, 1994, Captain Scarseth executed a second letter of resignation in lieu of court-martial, dated February 25, 1994.

This resignation letter was consistent with Army Regulation 635–120 and stated that his resignation was voluntary, that Captain Scarseth had not been subject to coercion, and that he had been fully advised and counseled by his assigned attorney, Captain Govern. Further, Captain Scarseth's February 25, 1994 letter stated that he understood the implications of his resignation and had been informed of his opportunity to attach matters in mitigation. The parties have stipulated that they have been unable to locate documents that were attached to the February 25, 1994 letter of resignation. Subsequently, on March 3, 1994, Captain Scarseth agreed for the resignation to be submitted to Army officials. According to Captain Scarseth, he did so because he felt pressured and he believed that Captain Govern would not defend him. According to Captain Scarseth, after he submitted his resignation in lieu of court-martial, he continued to forward mitigating information to his military counsel, Captain Govern.

Captain Scarseth alleges that he felt Captain Govern was reluctant to assist him in planning an aggressive defense to the charges against him. In a March 16, 1994, memorandum plaintiff expressed his dissatisfaction with Captain Govern's alleged "lack of professionalism, lack of time organizing/research and your desire to 'end this case as quickly as possible.'" When given the opportunity to request a new attorney on March 17, 1994, however, Captain Scarseth stated that he had wanted "to get something off his chest," and that he now believed that he and Captain Govern's communication would greatly improve. Captain Scarseth also indicated to Captain Govern that he had assembled numerous documents that he wanted to incorporate into his defense, and requested a meeting with Captain Govern.

On March 28, 1994, Captain Arnold forwarded Captain Scarseth's resignation to the Staff Judge Advocate at Fort McPherson, Georgia. In the accompanying memorandum, Captain Arnold indicated that he had received the plaintiff's letter of resignation on or about February 15, 1994, but that he, Captain Arnold, had agreed to hold Captain Scarseth's letter of resignation in his office to

allow plaintiff an opportunity to repay the travel voucher debt. Captain Scarseth, however, failed to make his repayment by the promised payment date. In a meeting with Captain Govern and Captain Scarseth, Captain Arnold asked Captain Scarseth why plaintiff had not met the debt repayment deadline. Captain Scarseth indicated he was angry about the repayment and did not understand why he could not obtain an honorable discharge.

Captain Govern submitted a request, on March 28, 1994, for a psychiatric examination of Captain Scarseth by a sanity board, citing Captain Scarseth's apparent alleged panic attacks and possible post-traumatic stress disorder. Captain Arnold recommended disapproval of the sanity board request to the Staff Judge Advocate at Fort McPherson and suggested that Captain Scarseth should be referred to trial "as soon as possible."

In a March 28, 1994 memorandum, Captain Arnold forwarded Mr. Scarseth's letter of resignation to the Fort McPherson Garrison Staff Judge Advocate with a recommendation that the resignation be disapproved and that the charges be referred to a court-martial. On March 30, 1994, Captain Arnold sent a memorandum to Captain Govern, responding to an amended sanity board request, indicating that he still would recommend that a sanity board be denied for failure to make a prima facie showing of mental incompetency.

On March 31, 1994, plaintiff Scarseth paid off the travel voucher indebtedness that he owed the Army. Plaintiff received a "cash collection voucher" from the finance office, which he forwarded to Captain Arnold as evidence of his repayment. On April 1, 1994, after receiving Captain Scarseth's voucher indicating that he had repaid the indebtedness to the Army, Captain Arnold changed his earlier recommendation to the Staff Judge Advocate to disapprove plaintiff's resignation in lieu of court-martial. He now recommended approval of Captain Scarseth's request to resign in lieu of court-martial, but recommended a discharge under other than honorable conditions.

Sometime during April, 1994, plaintiff contacted a civilian attorney, Reid Kennedy. After consulting with Mr. Kennedy, on April 21, 1994, Captain Scarseth submitted a request to the Department of the Army to withdraw his resignation, citing several reasons including his ongoing psychiatric care and alleged coercion by Captain Govern. On April 22, 1994, Captain Scarseth released Captain Govern from representing him.

Plaintiff's resignation was forwarded to the General Court–Martial Convening Authority (GCMCA) for consideration. Disciplinary proceedings against Captain Scarseth were stayed pending the processing of his resignation, in accordance with Army Regulation 635–120, paragraph 5–1b, dated June 1, 1989, as amended. On May 16, 1994, the GCMCA recommended approval of the resignation in lieu of court-martial, with a discharge under other than honorable conditions.

Plaintiff's resignation next was reviewed by the United States Army Ad Hoc Review Board. According to the record, the majority of the Ad Hoc Review Board members reviewed plaintiff's request to resign, and recommended acceptance with an other than honorable conditions discharge. The record does not reflect that the Board made any determination with respect to Captain Scarseth's request to withdraw his resignation. The dates in the record are somewhat confusing as to when the Ad Hoc Review board received, reviewed and acted on plaintiff's resignation, but these actions appear to have occurred after the GCMCA forwarded the resignation to the Board on May 16, 1994 and prior to the final decision on the resignation at the Army Deputy Assistant Secretary level. On June 17, 1994. John Matthews, the Deputy Assistant Secretary for the Department of the Army Review Boards and Equal Employment Opportunity Compliance and Complaints Review evaluated Captain Scarseth's request to withdraw his resignation, and disapproved the request. In the same memorandum, the Deputy Assistant Secretary concurrently approved the Army Ad Hoc Review Board's recommendation that the USAR accept Captain Scarseth's resignation for the Good of the Service, with an other than honorable discharge.

During the separation review process, from March 9, 1994 until June 15, 1994,

plaintiff was treated by Captain Gary Cabbage, a counselor, for anxiety, depression, and alleged post-traumatic stress disorder. On July 20, 1994, Captain Scarseth was admitted to Parkwood Hospital in Atlanta, Georgia for suicidal ideation. Plaintiff was released on July 21, 1994, to the medical facility at Fort Gordon, Georgia, and was extended on active duty for five days. He was discharged from the hospital on July 26, 1994. Captain Scarseth was discharged from the Army Reserve with an other than honorable discharge on July 27, 1994.

On July 25, 1995, Mr. Scarseth challenged the basis and character of his discharge before the Army Discharge Review Board (ADRB). Mr. Scarseth, with the assistance of civilian counsel, testified in an ADRB hearing on May 18, 1998 that his decision to resign was not voluntary, but coerced; that he had ineffective assistance of counsel prior to his resignation; that he was not given a reasonable period of time to consider resigning; that he was not given a psychiatric evaluation, although he was being treated for depression and post-traumatic stress disorder; and that there was an unexplained delay between the offenses he allegedly committed and when the Army brought the charges.

On May 22, 1998, the ADRB denied plaintiff's challenge to his discharge and rejected all of plaintiff's claims. The Board found that plaintiff voluntarily had requested separation from the Army, in lieu of trial by court-martial. Further, the Board found that all the applicable legal requirements and regulations were satisfied by the Army throughout the process and that former Captain Scarseth's rights were protected throughout the duration of the separation process. The Board noted that it had considered plaintiff's testimony, as well as argument and numerous documents submitted by his civilian counsel, including letters of recommendation, records of medical treatment, awards and OERs, and concluded that although plaintiff was under stress, he had resigned voluntarily. The ADRB also considered Mr. Scarseth's entire record and additional information submitted by him, and noted that release under other than honor-

able conditions is the normal release status granted in situations similar to that of Captain Scarseth.

## DISCUSSION

In the present action, plaintiff seeks redress on several grounds. Plaintiff asserts that at the time he resigned, he was in extreme emotional distress, and undergoing psychiatric treatment for depression and alleged post-traumatic stress disorder. Plaintiff argues that his resignation was not voluntary because he was subject to duress and suffered from mental incompetence, as well as ineffective assistance of counsel. Moreover, plaintiff argues he withdrew his resignation before it was legally effective and that the totality of his actions indicate that he was not resigning, but exploring alternative options. Plaintiff further argues that the Army Ad Hoc Review Board failed to address the attempted withdrawal of his resignation. In addition, according to the plaintiff, when his record was sent to the Army Ad Hoc Review Board, it was incomplete. Plaintiff also argues that the ADRB review of his discharge was arbitrary and capricious. Plaintiff seeks vacation of the action of the Secretary of the Army discharging him with an other than honorable discharge on July 27, 1994, reinstatement with backpay, and a disability retirement. Defendant moves to dismiss plaintiff's claim for lack of subject matter jurisdiction, contending that his resignation from the Army was voluntary and also moves to dismiss plaintiff's disability claim for failure to state a claim upon which relief can be granted, contending plaintiff has not exhausted administrative remedies. *See* Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims.

### *Motion to Dismiss*

Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, even on appeal. *Fanning, Phillips, Molnar v. West,* 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding & Dry Dock Co.,* 933

F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed.Cir.1997); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991); *Bowen v. United States*, 49 Fed.Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof on a motion to dismiss for lack of jurisdiction); *Schweiger Constr. Co. v. United States*, 49 Fed.Cl. 188, 205 (2001); *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988); *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001), *aff'd in part*, 281 F.3d 1376 (Fed. Cir.2002); *Bowen v. United States*, 49 Fed. Cl. at 675; *Vanalco, Inc. v. United States*, 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Consolidated Edison Co. v. O'Leary*, 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena*, 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States*, 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined*, (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied*, 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988) ("When the facts alleged in the complaint reveal 'any possible

basis on which the non-movant might prevail, the motion must be denied.'"); *RCS Enters., Inc. v. United States*, 46 Fed.Cl. 509, 513 (2000).

Pursuant to Rule 8(a)(1) of the Rules of the Court of Federal Claims (RCFC) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. at 45–46, 78 S.Ct. 99; *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir. 1998); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d at 1167 (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991)); *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir. 1995); *Hamlet v. United States*, 873 F.2d at 1416; *Ho v. United States*, 49 Fed.Cl. 96, 100 (2001), *aff'd*, 30 Fed.Appx. 964 (Fed.Cir. 2002); *Alaska v. United States*, 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on alle-

gations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. When considering a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to resolve any factual disputes. *See Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir. 1993), *cert. denied sub nom., Cedars–Sinai Med. Ctr. v. O'Leary,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."); *Vanalco v. United States,* 48 Fed.Cl. at 73 ("If the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute.").

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (1994). The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr,* 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1372 (Fed.Cir.), *reh'g* and *reh'g en banc denied* (2001); *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1372 (Fed.Cir.), *reh'g* and *reh'g en banc denied* (2001), *cert. granted,* —— U.S. ——, 122 S.Ct. 1604, —— L.Ed.2d ——, 2002 WL 104944 (2002); *Cyprus Amax Coal Co. v. United States,* 205 F.3d 1369, 1373 (Fed.Cir. 2000); *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1555–56 (Fed.Cir.1997), *cert. denied,* 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740

(1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.'" *White Mountain Apache Tribe v. United States,* 249 F.3d at 1372 (quoting *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948; *Tippett v. United States,* 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *Doe v. United States,* 100 F.3d 1576, 1579 (Fed.Cir.1996), *reh'g denied, en banc suggestion declined* (1997); *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 607, 372 F.2d at 1009.

### Voluntariness

As a preliminary matter, "strong policy reasons compel courts 'to allow the widest possible latitude to the armed services in their administration of personnel matters.'" *Voge v. United States,* 844 F.2d 776, 782 (Fed.Cir.) (quoting *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979)), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). *See also United States v. Testan,* 424 U.S. 392, 402, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) ("[O]ne is not entitled to the benefit of a position until he has been duly appointed to it."); *Orloff v. Willoughby,* 345 U.S. 83, 90, 73 S.Ct. 534, 97 L.Ed. 842 ("Whatever control courts have exerted over tenure or compensation under an appointment, they have never assumed by any process to control the appointing power either in civilian or military positions."), *reh'g denied,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953); *Thomas v. United States,* 42 Fed.Cl. 449, 452–53 (1998), *aff'd,* 217 F.3d 854 (Fed. Cir.1999) (table).

If a plaintiff's separation from the military is voluntary, no jurisdiction resides in the Court of Federal Claims. *Sammt v. United States,* 780 F.2d 31, 33 (Fed.Cir.1985). The United States Court of Appeals for the Federal Circuit reasoned in *Tippett v. United States:*

> If Tippett's discharge was involuntary and improper, his statutory right to pay was not extinguished and thus serves as a basis for Tucker Act jurisdiction. If, however, Tippett's discharge was voluntary, his right to pay ended upon his discharge. He thus would have retained no statutory entitlement to compensation, and consequently no money-mandating provision would support Tucker Act jurisdiction over his claim.

*Tippett v. United States,* 185 F.3d at 1255 (citations omitted); *see also Rigsbee v. United States,* 226 F.3d 1376, 1378–79 (Fed.Cir. 2000); *Gavin v. United States,* 47 Fed.Cl. 486, 489 (2000) (noting that a plaintiff who voluntarily resigns from active duty in the United States Armed Services divests the Court of Federal Claims of jurisdiction); *Soeken v. United States,* 47 Fed.Cl. 430, 434 (2000), *aff'd,* 20 Fed.Appx. 900 (Fed.Cir. 2001); *Thomas v. United States,* 42 Fed.Cl. 449, 452 (1998) (When a plaintiff has separated by choice, "it follows as a matter of logic that his final separation and retirement [was] not unlawful and, consequently, he is not entitled to reinstatement to active duty."), *aff'd,* 217 F.3d 854 (Fed.Cir.1999) (table).

In *Sammt v. United States,* 780 F.2d at 31, the United States Court of Appeals for the Federal Circuit clearly articulated the rule that a voluntary discharge bars jurisdiction over a military pay claim. In *Sammt,* the plaintiff was nonselected twice for promotion to the grade of lieutenant colonel, and pursuant to Army regulations was to be placed on a retired list after the nonselections. *Id.* at 31–32. However, Major Sammt voluntarily requested early retirement. *Id.* When he brought suit, Major Sammt argued that his nonselection had been based on erroneous information included in his records. *Id.* The Federal Circuit found that Major Sammt's retirement was voluntary and that, therefore, the trial court did not possess jurisdiction over plaintiff's claim. *Id.* at 33.

The court reasoned, "If his retirement was voluntary, no jurisdiction resides in the Claims Court .... To the extent that the civilian pay cases articulate the rationale that a choice of unpleasant alternatives does not make a choice involuntary, that rationale is applicable here." *Id.* at 33; *see also Moyer v. United States,* 190 F.3d 1314 (Fed.Cir. 1999). Similarly, the Federal Circuit has concluded in the civilian pay cases referenced in *Sammt,* that if an employee's retirement was voluntary, no jurisdiction resides in the United States Court of Federal Claims to review the case, and that the exercise of an option to separate is not rendered involuntary by the imminent imposition of a less attractive alternative, absent deception, coercion or duress. *See Griessenauer v. Dep't of Energy,* 754 F.2d 361, 364 (Fed.Cir.1985); *Covington v. Dep't of Health and Human Servs.,* 750 F.2d 937, 942 (Fed.Cir.1984) (dicta); *Taylor v. United States,* 219 Ct.Cl. 86, 92, 591 F.2d 688, 691–92 (1979); *Christie v. United States,* 207 Ct.Cl. 333, 338, 518 F.2d 584, 587 (1975).

The United States Court of Federal Claims consistently has followed *Sammt v. United States,* barring claims for back pay when a plaintiff's resignation or retirement was voluntary. *See, e.g., Gallucci v. United States,* 41 Fed.Cl. 631, 643 (1998) (finding that a former Captain's choice to voluntarily resign from the Marine Corps in the face of a recommendation for administrative discharge barred jurisdiction despite his assertion of severe mental stress and anxiety and that he was undergoing counseling); *Brown v. United States,* 30 Fed.Cl. 227, 229–30 (1993) (finding no jurisdiction to review a claim for reinstatement to active duty, retroactive promotion, back pay, and allowances when the plaintiff resigned "for the good of the service" following a recommendation of trial by court-martial), *aff'd,* 26 F.3d 139 (Fed.Cir. 1994) (table); *Longhofer v. United States,* 29 Fed.Cl. at 603 ("Since one who voluntarily retires has no entitlement to reinstatement, promotion, or back pay, we hold that this court lacks subject matter jurisdiction over Col. Longhofer's claim.").

██ A military resignation is presumed to be voluntary. *Gavin v. United States,* 47 Fed.Cl. 486, 489 (2000), *review dismissed,* 25 Fed.Appx. 882 (Fed.Cir.2001); *Heaphy v. United States,* 23 Cl.Ct. 697, 700 (1991), *aff'd,* 972 F.2d 1355 (Fed.Cir.1992) (table). A plaintiff can rebut this presumption by showing an absence of free choice. *Moyer v. United States,* 190 F.3d at 1320 (noting that a resignation is presumed to be voluntary but can be rebutted by a showing of government misrepresentation); *Tippett v. United States,* 185 F.3d at 1255 (finding that a voluntary resignation may be rendered involuntary if it is submitted under duress or coercion, or resulted from government misrepresentation); *Gavin v. United States,* 47 Fed.Cl. at 490 (holding that a presumption of voluntariness exists when an employee resigns); *Gallucci v. United States,* 41 Fed.Cl. at 638; *see also Scharf v. Dep't of the Air Force,* 710 F.2d 1572, 1574–75 (Fed.Cir.1983) (misrepresentation); *Christie v. United States,* 207 Ct.Cl. 333, 338, 518 F.2d 584 (1975) (coercion, duress). As discussed above, the exercise of an option to retire is not rendered involuntary by the impending prospect of a less desirable alternative. *See Christie v. United States,* 207 Ct.Cl. at 338, 518 F.2d at 587.

██ A plaintiff may attempt to demonstrate that a resignation was not voluntary, because the resignation was procured by duress. This plaintiff, however, has failed to show that he was subject to duress and that such action caused him to resign against his will. In *Christie v. United States,* the Court held that to prove duress, a plaintiff must demonstrate: "(1) that one side involuntary accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the results of coercive acts of the opposite party." *Christie v. United States,* 207 Ct.Cl. at 338, 518 F.2d at 587 (citing *Fruhauf Southwest Garment Co. v. United States,* 126 Ct. Cl. 51, 62, 111 F.Supp. 945, 951 (1953)); *see also Gavin v. United States,* 47 Fed.Cl. at 490 (the presumption of voluntariness can be rebutted by showing that the government wrongfully caused plaintiff's duress or coerced plaintiff into resigning); *Gallucci v. United States,* 41 Fed.Cl. at 638; *Nickerson v. United States,* 35 Fed.Cl. 581, 586 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997) (table);

*Bergman v. United States,* 28 Fed.Cl. 580, 585–86 (1993). In addition, the court has indicated that the duress exception is not a disjunctive test and requires that a plaintiff prove all three elements of the duress test to prevail. *See Nickerson v. United States,* 35 Fed.Cl. at 586. Duress is measured objectively, not through an employee's subjective evaluation of a situation. *See Christie v. United States,* 518 F.2d at 587. "An otherwise voluntary resignation or request for discharge is rendered involuntary if it is submitted under duress or coercion, or results from misrepresentation or deception on the part of government officers." *Tippett v. United States,* 185 F.3d at 1255; *see also Moyer v. United States,* 190 F.3d at 1320.

*Ineffective Assistance of Counsel*

■ As part of his argument that he was coerced into resigning, Mr. Scarseth contends that he was denied effective assistance of counsel, which, according to the plaintiff, resulted in his having no alternative but to resign. Plaintiff Scarseth asserts that his military defense counsel, Captain Govern, refused to examine and present evidence in Scarseth's case, and, according to the plaintiff, told plaintiff that he could not represent him at trial because he had to attend Judge Advocate General (JAG) training school during the time Scarseth's court-martial would be scheduled. In addition, plaintiff alleges that Captain Govern represented to plaintiff he had no chance of avoiding conviction, prison and dismissal from the service, so that there were no other alternatives to resignation, that counsel failed to tell plaintiff he was entitled to a psychiatric evaluation of mental competence in connection with his resignation, and that counsel did not assist him properly to withdraw his resignation. Plaintiff tries to support his allegations with assertions made before the ADRB by his counsel at the time, Edward Zimmerman, and an affidavit from his first civilian attorney, Reid Kennedy, who took over Scarseth's case when plaintiff released Captain Govern.

The United States Supreme Court held in *Strickland v. Washington* that to prove ineffectiveness of counsel, a claimant must first show that counsel's performance was deficient.

> This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive defendant of a fair trial . . . .

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); *see also Mickens v. Taylor,* —— U.S. ——, 122 S.Ct. 1237, 1240, —— L.Ed.2d —— (2002) ("[A] defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (quoting *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. 2052)). In a military proceeding, the same standard is applied as set forth by the Supreme Court in *Strickland. See Longval v. United States,* 41 Fed.Cl. 291, 296 (1998) (citing *Allen v. Van Cantfort,* 316 F.Supp. 222, 230 & n. 10 (D.Me.1970)).

Plaintiff argues in his brief that the defendant violated Army Regulation 635–120, paragraph 5–5, which requires that plaintiff "be afforded the opportunity to consult with qualified legal counsel . . . ." According to the plaintiff, since he only received a "one-way communication" with Captain Govern, he did not receive adequate assistance of counsel. Plaintiff also alleged that Captain Govern refused to examine the evidence plaintiff submitted to him and became angry with plaintiff when plaintiff requested him to review the evidence with him. Plaintiff's only forms of support are his own allegations related in his complaint and an affidavit from his civilian counsel, Reid Kennedy. Defendant denies plaintiff's allegations. Defendant also responds that the record demonstrates that Captain Govern regularly corresponded with plaintiff before both reported to Fort McPherson, Georgia for the Article 32 investigation on February 14, 1994 and met with the plaintiff several times before plaintiff's

resignation was submitted to Army representatives.

Mr. Scarseth has failed to demonstrate that Captain Govern's actions rise to the level of ineffective assistance of counsel. As noted, to prove ineffectiveness of counsel, a claimant must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052. Plaintiff has not even demonstrated that counsel made serious errors or that Captain Govern did not adequately advise him. *See id.*

The record demonstrates that Captain Govern and plaintiff regularly corresponded, in addition to in-person meetings held by Captain Govern with the plaintiff at Fort McPherson and at Fort Benning, Georgia. Among the correspondence in the record is an undated letter the plaintiff sent to Captain Govern expressing that he needed Captain Govern's assistance in facilitating his desire to resign his commission. Captain Govern responded on January 4, 1994, offering his opinion that the USAR would likely be amenable to a resignation for the good of the service. Captain Govern's January 4, 1994, letter also indicates that Captain Govern had consulted with his supervisor, who agreed that plaintiff's optimal course of action, under the facts and circumstances present, would be for plaintiff to resign and thereby avoid a potential court-martial. The parties stipulate that Captain Govern enclosed a copy of the pertinent regulations, an entitlements and benefits chart, and a request that plaintiff enclose matters that plaintiff thought the USAR should consider in support of the resignation and a reminder on the right to remain silent and the right to an attorney when questioned by investigators.

Plaintiff further contends that Captain Govern failed to attach mitigating documents to plaintiff's resignation packet, which plaintiff alleges he supplied to his counsel. Plaintiff, however, has failed to show that he was prejudiced by Captain Govern's representation. *See Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. 2052 ("[A] court ... must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). In spite of the possibility, as alleged by plaintiff, that no mitigating matters in support of the resignation were attached to the resignation, a majority of members (three of five) of the Army Ad Hoc Review Board recommended acceptance of plaintiff's request to resign. The other two Board members voted not to accept the resignation, voting instead in favor of court-martialing the plaintiff. The recommendation of the Ad Hoc Review Board subsequently was adopted by the Deputy Assistant Secretary, and plaintiff's request to resign was approved.

Apparently, mitigating documents also may not have been attached to plaintiff's request to withdraw his resignation, but for this, plaintiff, not his military defense counsel, must bear responsibility. Plaintiff relieved his military counsel and submitted his request to withdraw his resignation in April, 1994. Plaintiff's request to withdraw his resignation, dated April 21, 1994, stated that: "Unfortunately, sufficient time does not remain for me to copy and include my extensive documentation as an attachment [to the request to withdraw his resignation]." Plaintiff apparently did not ever provide his "extensive documentation" to accompany the withdrawal of his resignation, nor does the record reflect a request for an extension of time in order to do so.

The record reflects, however, that plaintiff subsequently provided the ADRB with documentation in explanation, mitigation, or defense,[2] and also had the opportunity before

---

**2.** The record reflects that the ADRB was provided and reviewed a number of exhibits, including petitioner Scarseth's brief, to which were attached the following exhibits selected by plaintiff and his counsel, namely: awards and OERs, a memorandum from the finance office dated June 9, 1992, a memorandum dated June 9, 1992 confirming his home of record as in Minnesota, orders to active duty dated January 25, 1992, Record of Medical treatment from March 9, 1994 to April 4, 1994. Memorandum of Remittance with a note to Captain Arnold dated March 31, 1994. Request to Withdraw Resignation, affidavit of his civilian counsel Reid Kennedy and selected supportive, additional affidavits.

the ADRB to tie the documentation to his resignation in lieu of court-martial and discharge Under Other Than Honorable Conditions (UOTHC). As will be discussed more fully below in addressing defendant's motion for judgment on the administrative record, the ADRB, after a review of the documentation provided by plaintiff and the opportunity by plaintiff and civilian counsel to highlight its importance, rejected plaintiff's attack on both the resignation and character of the discharge.

In addition, military counsel's alleged failure to attach supporting affidavits to plaintiff's sanity board request (*see* R.C.M. 706, Manual for Courts–Martial (1984)) became moot with the GCMCA's decision to hold in abeyance further disciplinary proceedings, pending the processing of the plaintiff's resignation. *See* Army Regulation 635–120, paragraph 5–1b, dated June 1, 1989, as amended. As will be discussed below, the issue of whether or not a psychiatric evaluation should have accompanied plaintiff's resignation is not a sanity board issue, but one presented by paragraph 5–2c(5) of Army Regulation 635–120, which states that such an evaluation will accompany resignations if the service member is "mentally defective, deranged, or abnormal."

The impetus leading to criminal charges being preferred against plaintiff and a possible court-martial of plaintiff was a CID investigation report which concluded that plaintiff had committed travel voucher fraud, forgery, obstruction of an investigation by suborning perjury and that plaintiff owed money to the government as the result of his incorrect travel voucher submissions. Attached to the CID Final Report of Investigation are a number of affidavits which support the conclusions, including the affidavit of Felix Gardner, indicating that plaintiff had asked him to change his earlier statements to investigators, analysis of travel and military pay vouchers, together with the alleged inaccurate travel vouchers signed by the plaintiff, and the alleged inaccurate lodging receipts. A review of the Army CID investigation in the record indicates that Captain Govern's advice to submit a resignation in lieu of court-martial cannot be considered improper.

Plaintiff acknowledged to investigators that he was living and reporting for reserve duty in Tallahassee, Florida, while claiming travel pay from other locations. The CID report indicates that plaintiff pleaded with his landlord, Mr. Gardner, to change his previous statement that plaintiff had paid small amounts in rent, to state instead that plaintiff had paid him $4,000.00 in rent and also to state that Mr. Gardner had signed rent receipts, rather than plaintiff, who had signed Mr. Gardner's name. The record indicates that Mr. Gardner stated that he "would not lie for him [plaintiff]," increasing plaintiff's exposure to the criminal charges. The conclusions in the CID investigation report provided a valid and reasonable basis under the circumstances for counsel's conclusions and advice to plaintiff to resign in lieu of court-martial.

After receiving the CID Report of Investigation, the responsible Army officials took the serious step of ordering Captain Scarseth to report for active duty at Fort McPherson by February 14, 1994 for the purposes of an Article 32 investigation, which plaintiff did on February 14, 1994. In sum, Captain Govern appears to have concluded that based on a review of the evidence, and after conferring with his client, that Captain Scarseth's recommended course of action would be to resign in lieu of court-martial because his client risked being convicted and sentenced to prison, as well as being dismissed from the service. The record also reflects that Captain Govern consulted with his supervisor, the Regional Defense Counsel, who confirmed that Captain Scarseth's best recommended course of action would be to submit a resignation in lieu of court-martial.

Mr. Scarseth further asserts that the Army and his counsel misrepresented information to plaintiff by failing to inform him, pursuant to Army Regulation 635–120, paragraph 5–2(c)(5), that he could ask for a psychiatric evaluation and that such an evaluation should be attached to the plaintiff's request for resignation. The regulation in question reads:

 5–2(c) In addition to the information required by ¶ 2–3 and figure 5–1, the follow-

ing data will accompany the resignation
....

\* \* \* \* \* \*

(5) A psychiatric evaluation if any reasonable grounds exist to indicate that the officer is, or was at the time of his or her misconduct, mentally defective, deranged, or abnormal.

There is no indication in the record that plaintiff was mentally incapacitated at the time of the submission of the alleged fraudulent travel vouchers or the attempt to get Felix Gardner to change his testimony. In fact plaintiff states in his request to withdraw his resignation that he does not contend that his mental condition raises to a defense to the court-martial charges. Rather, plaintiff argues that he was under stress, and perhaps physically not well. Furthermore, now Major Govern stated in a sworn declaration that "Mr. Scarseth appeared at all times to understand the nature and seriousness of the proceedings facing him. In my opinion, he did not have a mental disease or defect that prevented him from exercising sound judgment." Major Govern stated, "I also believe that Mr. Scarseth was fully capable of understanding the consequences of his actions. He voluntarily submitted his request for discharge in lieu of court-martial free of any deception, misrepresentation, coercion, or duress. I believed then, and believe now, that this was a wise decision on his part." The issue of mental incapacity is further addressed below.

In addition, plaintiff alleges that Captain Govern failed to inform plaintiff that long delay could affect his case in accordance with Army Regulation 635–120, paragraph 5–2(c)(4).

(c) In addition to the information required by paragraph 2–3 and figure 5–1, the following data will accompany the resignation ....

\* \* \* \* \* \*

(4) When applicable, an explanation of any abnormal delay from date of offense to date of completion of investigation and submission of resignation.

The last of the alleged offenses occurred in October, 1991, but were not reported to investigators until March, 1992. The CID investigation report was dated June 25, 1992. At the conclusion of the Army CID investigation, the finance office and plaintiff discussed the amount of the overpayments and recoupment action to recover the amount due the government. The finance office began to collect plaintiff's indebtedness in December 1992 by monthly allotments from plaintiff's military paychecks to reimburse the overpayments. Plaintiff had not completed repayment to the government when his commander preferred criminal charges against him on December 11, 1993. Plaintiff submitted his resignation within three months of the preferral of charges. Plaintiff has not substantiated that the delay ascribed by plaintiff to the defendant was "abnormal," but even if it were to be considered so, plaintiff has not shown how he was prejudiced by the absence of an explanation of the time line from offense to resignation. Since the majority of the time in question was consumed by delays to allow plaintiff to repay the indebtedness with monthly allotments from his military paychecks, no prejudice to plaintiff is apparent.

Now Major Govern's declaration also states that at the outset of his representation of Captain Scarseth, Captain Govern advised his client of his prerogative to request alternative military counsel and his right to obtain civilian counsel at his own expense. The parties also have stipulated that:

Captain Scarseth faxed a memorandum to Captain Govern, dated March 16, 1994, expressing his dissatisfaction with Captain Govern's "lack of professionalism, lack of time organizing/research and your desire to 'end this case as quickly as possible.'" He indicated that he was in the process of obtaining copies of checks he had written at [sic] during the period of the alleged crimes, and was completing documentation and comments dealing with the charges. He also expressed a dissatisfaction with Captain Govern's failure to consider the "strain and effect" that his sister's death had upon him during the Gulf War, and threatened to contact the Chain of Command, the Inspector General and his senators and congressmen for assistance. The

next day, when given the opportunity to obtain a new attorney, Captain Scarseth responded that he would not request a new attorney. He indicated that he wanted to clear the air and get something off his chest, and that he believed their communication would improve dramatically.

In other correspondence, plaintiff thanked Captain Govern "for your on-going assistance in this matter." Although in April, 1994, plaintiff exercised his right to retain civilian counsel, plaintiff has not overcome the presumption that Captain Govern's conduct as plaintiff's attorney "falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052.

In sum, although plaintiff has expressed dissatisfaction with the advice provided by counsel, and ultimately changed counsel, plaintiff's other allegations fall short of documenting a case of ineffective assistance of counsel. The standards for offering adequate or even good legal representation do not require the attorney to be able to predict the outcome of proceedings with 100 percent accuracy, only to offer his or her best, carefully considered advice based on his or her expertise and legal training. *See Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052 (discussing presumption of advice as sound strategy and noting that even the best attorneys will not defend a particular client in the same way). The record does not reflect that Captain Govern misrepresented facts regarding his best assessment, as validated by his supervisor, of the likely outcome of an Article 32 investigation and trial by court-martial. There is no indication in the record that Captain Govern failed in his responsibilities, and certainly not to the extent identified in *Strickland v. Washington,* so as to result in a successful claim of ineffective assistance of counsel by this plaintiff.

*Withdrawal of Resignation*

Plaintiff also contends that although he signed a formal resignation memorandum which was forwarded to and accepted by an Army Deputy Assistant Secretary, he never really wanted to resign and receive a less than honorable discharge. Plaintiff argues that he was still exploring his options at the time the resignation was sent forward. In his brief filed with this court, plaintiff also argues that he "withdrew his resignation before it was legally submitted." Plaintiff submits that he repeatedly expressed his desire to put his resignation on hold, that he had not yet decided whether to resign, that he wanted to retain his reserve status, that he would prefer not to resign if there was a more favorable option and that resigning is something he would "hate to do." Defendant responds by asserting that a request to withdraw a resignation after it is submitted does not have any effect upon the voluntariness of a prior submitted resignation, and that the decision to accept or deny a withdrawal of resignation is within the discretion of the Army.

Although plaintiff may not have been completely content with his choice to resign before and after he submitted his resignation, in the same letters that he expressed reservations about resigning, plaintiff repeatedly expressed his intent to resign. First, in an undated letter by plaintiff to Captain Govern, which Captain Govern responded to on January 4, 1994, plaintiff told his counsel of his "desire to resign my commission" and "respectfully request[ed] that my resignation be accepted," noting that he "understand[s] that submitting my resignation with appropriate documentation as to my medical conditions/circumstances is in the best interest of the Army and myself."

Second, according to the joint stipulations submitted by the parties, the parties have stipulated that plaintiff submitted a resignation along with a letter to Captain Govern dated February 1, 1994; the February 1, 1994 letter has not been found by the parties. Third, in the Joint Stipulation of Facts, the parties state:

Sometime after arriving at Fort McPherson, Captain Scarseth executed a letter of resignation. The resignation letter stated, as required and specified by Army Regulation 635–120, that 1) the resignation was voluntarily tendered; 2) he was not subject to coercion with respect to the resignation; 3) he had been fully advised and counseled by Captain Govern on January 4, 1994, and understood the implications of the resigna-

tion; 4) he understood that the resignation, if accepted, may be considered as being under other than honorable conditions; 5) he understood that the resignation could only be withdrawn with the approval of Headquarters, Department of the Army; and 6) that he had been informed of his opportunity to submit matters in mitigation and extenuation, and that such matters were attached. The parties have been unable to find documents that were attached to the letter of resignation.

From the record, the document that matches the description of plaintiff's formal resignation letter is the February 25, 1994 memorandum, titled "Resignation for the Good of the Service," with a signature line for Captain Paul J. Scarseth. The copy included in the record is not signed. However, at no time during this case has either party contested the existence of a properly executed resignation in lieu of court-martial.

An examination of plaintiff's request to withdraw his resignation is instructive for what it reveals about the resignation. The request to withdraw plaintiff's resignation was prepared with the assistance of civilian counsel. The request states that: "At the time I submitted my resignation, I had been represented by Captain Kevin Govern, JAGC, Fort Benning, Georgia." The request also refers to "my letter of resignation," but does not, in over two pages of text, state or even suggest that plaintiff was merely exploring options, that he withdrew the resignation before it was submitted, that the resignation was on hold, or that he really had not decided whether or not to resign. The language of plaintiff's request to withdraw his resignation clearly addresses a resignation which had been previously submitted to the Army.

■ Defendant also correctly contends that Captain Scarseth was not forced to resign due the fact that he had no other alternative. On the contrary, Captain Scarseth was unfortunately faced with two inherently unpleasant situations. *See Sammt v. United States,* 780 F.2d at 32 (concluding that "as we have in civilian pay cases, that the exercise of an option to retire [from the Army] is not rendered involuntary by the imminent impo-

sition of a less desirable alternative."); *Christie v. United States,* 518 F.2d at 587–88 (finding that a former civilian employee's choice to resign and accept discontinued service retirement instead of opting to "stand pat" and challenge the validity of her discharge for cause was voluntary and lacked government sponsored duress in spite of her choice between two unpleasant alternatives); *Gavin v. United States,* 47 Fed.Cl. at 491 ("[A] presumption of voluntariness cannot be overcome simply because plaintiff is confronted with 'a choice of unpleasant alternatives.'" (quoting *Sammt v. United States,* 780 F.2d at 33)); *Brown v. United States,* 30 Fed.Cl. at 229–30 (finding former Army reservist's resignation "for the good of the service" pending a court-martial was voluntary and lacked duress caused by government action); *Longhofer v. United States,* 29 Fed.Cl. at 602 (holding that plaintiff's retirement was voluntary when plaintiff himself selected the terms and the date of his retirement instead of continuing to serve until his involuntary retirement). The fact that plaintiff Scarseth was required to choose between submitting a voluntary resignation and facing trial by court-martial does not render his resignation involuntary.

■ In the instant case, the record indicates that the Deputy Assistant Secretary of the Army, John Matthews, exercised his discretion to deny plaintiff's April 21, 1994, request to withdraw his resignation. Moreover, the decision to accept or deny a resignation from the service rests solely within the discretion of the Secretary of the Army, and the exercise of that discretion will be sustained unless it is exercised in a manner which is arbitrary, capricious or not in accordance with law. Plaintiff's own resignation, dated February 25, 1994, indicated that it can be withdrawn only with the approval of Headquarters, Department of the Army. *See* Army Regulation 635–120, paragraph 2–4b and Figure 5–1, paragraph 4, dated June 1, 1989, as amended; *Cole v. United States,* 231 Ct.Cl. 702, 704, 689 F.2d 1040, 1041 (1982); *see also Brown v. United States,* 30 Fed.Cl. at 230 ("Plaintiff fails to recognize, however, that his request for a withdrawal has no effect on his prior resignation.

First, the decision to deny or accept a withdrawal of resignation from service rests solely within the discretion of the Army.") The Secretary of the Army's decision to deny plaintiff's request to withdraw the resignation at issue in *Brown* did not render it involuntary, because the decision of the Army "must be granted substantial deference." *Brown v. United States*, 30 Fed.Cl. at 231. Similar to the plaintiff in *Brown v. United States*, plaintiff resigned in lieu of facing court-martial, and it was within the Army's discretion to decide whether to allow plaintiff to withdraw his resignation. *See id.* at 231. *See also Orloff v. Willoughby*, for a discussion of deference to the military in military personnel matters. *Orloff v. Willoughby*, 345 U.S. at 90, 73 S.Ct. 534.

In *Moyer v. United States*, the court held that a former Army officer's resignation was voluntary when it was submitted in lieu of court-martial. *Moyer v. United States*, 190 F.3d 1314, 1320–21 (Fed.Cir.1999). The plaintiff in *Moyer* argued that he had involuntarily resigned because he was not informed that Army regulations required that his medical discharge be processed before his resignation became final. *See id.* at 1316. The plaintiff in *Moyer* argued that his supervisor and his attorney had both misled him before he resigned by indicating that his discharge for disability would be processed concurrently with review of his resignation. *See id.* at 1317. Mr. Moyer's letter of resignation indicated the following: (1) he voluntarily resigned for the Good of the Service, (2) he had not been subject to coercion with respect to his resignation, (3) he had been advised of and fully understood the implications of his resignation, and (4) he understood that he was forfeiting all rights stemming from his time in the service. *See id.* Moyer subsequently submitted a request to withdraw his resignation three days after submitting it. *Id.* at 1316.

In rejecting Moyer's argument, the United States Court of Appeals for the Federal Circuit held that plaintiff's resignation was voluntary and that plaintiff had failed to set forth evidence beyond his own affidavit to prove he was misled by Army officials. *See id.* at 1320. Analogous to the circumstances in *Moyer*, Mr. Scarseth has not provided evidence beyond his own assertions, and those of his civilian attorneys, after the fact, that he was misled into resigning. *See id.* In addition, it appears from the record that plaintiff Scarseth resigned to avoid trial by court-martial, which the Federal Circuit in *Moyer v. United States* similarly found was an important factor to consider as an indication of plaintiff's motive to resign instead of facing a trial by court-martial. *See id.* In this case, plaintiff Scarseth has not demonstrated that his resignation of February 25, 1994, was involuntary. To the contrary, as noted below, substantial evidence supports the ADRB's finding that plaintiff's resignation was voluntary under the law.

Similar to the plaintiff in *Moyer v. United States*, the record reflects that Scarseth submitted a letter of resignation dated February 25, 1994, indicating the following: (1) that his resignation was voluntarily tendered, (2) that he was not coerced to resign, (3) that he had been fully advised and counseled by his counsel Captain Govern, (4) that he understood that the resignation, if accepted, may be considered as being under other than honorable conditions, (5) that he understood that the resignation could only be withdrawn with the approval of Headquarters, Department of the Army, and (6) that he had been informed of his opportunity to submit matters in mitigation and extenuation, and that such matters were attached. Captain Scarseth's letter explicitly states that he understood the implications of his resignation. *See Moyer v. United States*, 190 F.3d at 1316; [3] *Christie v. United States*, 518 F.2d at 587.

---

3. In contrast to *Moyer*, in *Tippett v. United States*, the United States Court of Appeals for the Federal Circuit held that the plaintiff's resignation was rendered involuntary by his attorney's misrepresentation regarding the legal consequences of the plaintiff's resignation. *Tippett v. United States*, 185 F.3d 1250, 1258 (1999). The Federal Circuit found the fact that the plaintiff had been told that

if he resigned he could still be in the reserves rendered the resignation involuntary, as the advice was legally incorrect. *See id.* In plaintiff's case, there is no indication in the record that plaintiff was given incorrect information, incorrect legal advice or that the available alternatives were not explained to him.

*Mental Incapacity*

 Plaintiff also suggests that his resignation was involuntary because at the time of his resignation he may not have been mentally competent. In order to invoke the mental incompetence exception to the presumption of voluntariness, plaintiff must show that he was emotionally disturbed and incapable of understanding his actions. *See Scharf v. Dept. of Air Force,* 710 F.2d at 1574; *Manzi v. United States,* 198 Ct.Cl. 489, 492, 1972 WL 20799 (1972); *see also Gallucci v. United States,* 41 Fed.Cl. at 642; *McEntee v. United States,* 30 Fed.Cl. 178, 184 (1993), *aff'd,* 39 F.3d 1197 (Fed.Cir.1994) (table). Courts have distinguished when a mental condition renders a resignation involuntary and when the mental condition does not. *See generally, Manzi v. United States,* 198 Ct.Cl. at 505, 1972 WL 20799. In *Manzi v. United States,* a psychiatrist confirmed that the plaintiff was not capable of understanding his actions at the time of his resignation due to the fact that he was suffering from schizophrenia. The court indicated that the effects of schizophrenia "interfered with his [plaintiff's] clear thinking" and caused plaintiff to be of "unsound mind." *Id.* In addition, the court considered the fact that in *Manzi,* the plaintiff had an over ten-year history of mental illness and three psychiatrists had concurred with the conclusion that plaintiff was unable to render a voluntary decision at the time of his resignation. *See id.* at 502–505.

 In the instant case, plaintiff reports that he saw a counselor, Mr. Gary Cabbage, from March 9, 1994, through June 15, 1994, for anxiety, depression, and alleged post-traumatic stress disorder and was briefly hospitalized in July, 1994. Plaintiff, however, has failed to provide evidence that he was not competent on February 1, 1994, or February 25, 1994 when he submitted resignations in lieu of court-martial to his counsel. There is no evidence that plaintiff was rendered unable to competently decide whether to resign from the USAR.

The facts in *Gallucci v. United States* are similar to those in Mr. Scarseth's case. *Gallucci v. United States,* 41 Fed.Cl. at 642. In *Gallucci,* the court found that the plaintiff had failed to set forth sufficient evidence to

indicate that he was mentally incompetent when he retired although he visited a psychotherapist after he resigned for severe depression, despair, and suicidal thoughts. *See id.* The court held that even a plaintiff who is undergoing mental counseling at the time of resignation cannot successfully argue that a resignation is involuntary in the absence of demonstrating that he was "incapable of exercising free will or understanding his actions" at the time of resignation. *Id.* In this case, Captain Scarseth's post-resignation visits to a psychologist from March 9, 1994 through June 15, 1994, for anxiety, depression, and post-traumatic stress disorder, in addition to his hospitalization on July 20, 1994, resemble the post-resignation consultation with a psychotherapist of the plaintiff in *Gallucci v. United States. See id.*

Plaintiff's second resignation letter was dated February 25, 1994. Plaintiff subsequently was treated by Gary Cabbage, a counselor, from March 9, 1994 through June 15, 1994 for anxiety, depression and post-traumatic stress disorder. The medical records recorded by Mr. Cabbage in March, 1994 also indicate that plaintiff's chief complaint was "anxiety." On July 20, 1994, plaintiff was admitted to a civilian hospital for "suicidal ideation," then was evacuated to a military hospital on July 21, 1994, from which he was discharged on July 26, 1994. The record also contains a letter, dated May 13, 1998, plaintiff requested from Ernest Boswell, Ph.D., a clinical psychologist, who saw plaintiff on August 30, 1994. The Boswell letter concluded that he had found no evidence of a personality disorder of sociopathic or psychopathic tendencies, but that plaintiff's "level of psychological functioning is quite likely compromised when he is under periods of stress. The presence of stressors could influence his ability to concentrate and reach logical conclusions, evaluate alternative options and effectively negotiate interpersonal conflicts."

Plaintiff also was evaluated by Dr. Michael J. McClure, a psychiatrist at Fort Gordon, Georgia, on June 16, 1994. Plaintiff first met Dr. McClure when plaintiff was admitted to the psychiatric ward at Fort Gordon, Georgia. Dr. McClure indicates that psychologi-

cal tests were performed on plaintiff and that Dr. McClure personally observed plaintiff and assessed his mental state on numerous occasions. Dr. McClure concluded that plaintiff did not suffer from post-traumatic stress disorder (PTSD), but from a "Narcissistic Personality Disorder and was mildly depressed at the times I saw him, but this was not mentally debilitating." In a sworn declaration, with attached medical records, Dr. McClure continued:

> In addition to personal psychiatric diagnostic and therapeutic interviews that I conducted, I also garnered information from the observations of other clinical staff on the psychiatric unit and received the specialized input of COL Celso Bolet, M.D., whom specifically assessed CPT Scarseth with regards to the possible presence of Posttraumatic Stress Disorder [PTSD]. COL Bolet concurred with my diagnostic impressions of CPT Scarseth during both of these hospitalizations at DDEAMC [Dwight D. Eisenhower Army Medical Center, Fort Gordon, Georgia].... COL Bolet did not support any such diagnosis [of PTSD].... Although [plaintiff] was repeatedly assessed with regards to the possible presence of this disorder [PTSD], he was not ever diagnosed with the condition by any clinical provider credentialled to make such a determination. Mr. Gary Cabbage, M.Ed. is the only individual of which I am aware that seriously entertained this diagnosis. However, it is noted that Mr. Cabbage's academic training was as a teacher and school counselor.... Moreover, at the time that Mr. Cabbage considered the possibility of PTSD, CPT Scarseth had not yet submitted to psychological testing, nor had he been intensely observed as part of an extended psychiatric hospitalization.... In my eight years of serving as a psychiatrist in the U.S. Army, I have conducted many mental status evaluation and sanity boards for administrative eliminations and courts-martial. CPT Scarseth was mentally competent to understand and participate in the proceedings of either a court-martial or an administrative elimination. He was mentally competent to assist in his own defense, and he was capable of appreciating the conse-

> quences of his actions. CPT Scarseth possessed no mental or psychiatric problem that prevented him from voluntarily making any decision that affected his own self-interests, including the decision of whether to submit a request for discharge in-lieu-of-court-martial.... While I was treating CPT Scarseth, he attempted to remove some of his medical records from his treatment file. I confronted him about the missing records and CPT Scarseth produced them for me. Moreover, he admitted that he had removed the records from his file with the intention of altering the documents and then placing them back into the file. He stated there were several portions of his history and physical that he did not like and he was going to change them. This behavior is one of many examples of dysfunctional, immature and antisocial behaviors that are consistent with an over-all sense of entitlement with [sic] is a key aspect of Narcissistic Personality Disorder, which was his primary psychiatric disorder.... Over the course of my military career, I have personally participated in many sanity boards and related mental status examinations. The evaluation that CPT Scarseth received under my care was in fact much more thorough than what would be performed pursuant to any sanity board. Moreover, I personally spoke with CPT Scarseth's commander and provided him with a completed Form 3822R Report of Mental Status Examination documenting his intact cognitive status and lack of any significant depression, psychosis, or other symptoms of a major psychiatric disorder other than personality pathology.... Discounting his repeated efforts to feign symptoms that were not factual in nature and symptoms that were resultant from his characterologic pathology, CPT Scarseth consistently displayed a level of distress that was well within the normal realm for individuals in a similar situation.

Dr. McClure's statement is unrefuted in the record. The evidence does not support plaintiff's allegation that he was unable to render a competent decision with respect to his resignation. Unlike the plaintiff in *Manzi*, plaintiff Scarseth has not suffered from

over a decade with a serious illness such as schizophrenia. *See Manzi v. United States,* 198 Ct.Cl. at 502–505, 1972 WL 20799. Plaintiff has failed to show that he was mentally incompetent at the time he submitted his resignation. *See id.*

In sum, plaintiff Scarseth has not demonstrated that his resignation from the Army was involuntary by reason of duress, coercion, misrepresentation or mental incapacity. The Army did not improperly fail to allow the plaintiff to withdraw his resignation, once tendered. Moreover, Captain Govern's representation of plaintiff was not inadequate and does not point to "errors so serious that counsel was not functioning as the 'counsel' guaranteed to the defendant." *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052; *see also Mickens v. Taylor,* —— U.S. at ——, 122 S.Ct. at 1240. Therefore, the court is without subject matter jurisdiction and plaintiff's complaint must be dismissed.

### Disability Claim

 Plaintiff also contends that he is entitled to a disability hearing in this court, that the court should assign him a disability rating consistent with the VA's 80 percent rating[4] and award him a disability retirement. Plaintiff alleges in his amended complaint, although there is no other documentation in the record, that his already existing condition was severely aggravated during his service in the Persian Gulf War by exposure to noxious fumes, causing a severe respiratory condition, including sinusitis, asthma, bronchitis and rhinitis, and that the Veterans Administration has rated him 80 percent disabled. Plaintiff further states in the amended complaint that Army personnel did not explain to him, "the right to seek evaluation for a service-connected medical disability and be referred to a Medical Evaluation Board [MEB] and a Physical Evaluation Board [PEB] to determine his entitlement to a military disability rating to qualify for military medical retirement benefits."

Defendant agrees that plaintiff's disability claim has not been considered by an MEB and/or PEB, or reviewed by the Army Board for Correction of Military Records. The defendant, therefore, argues that plaintiff has not exhausted his administrative remedies. According to the defendant, plaintiff's disability claim should be dismissed for failure to state a claim upon which relief can be granted, since plaintiff has not first sought disability benefits before a military review board. The general rule is that, "Congress has given the function of deciding entitlement to disability retirement to the [Service] Secretary, acting with or through a statutory board, and that the claim does not accrue until final action on the basis of the determination of the first competent board to decide." *Friedman v. United States,* 159 Ct. Cl. 1, 18, 310 F.2d 381, 392 (1962), *cert. denied sub nom. Lipp v. United States,* 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963); *see also Real v. United States,* 906 F.2d 1557, 1560 (Fed.Cir.1990) ("[d]isability retirement pay [claims] do not accrue until the appropriate board either finally denies such a claim or refuses to hear it."); *Noguera v. Office of Pers. Mgmt.,* 878 F.2d 1422, 1425 (Fed.Cir.1989) (plaintiff's disability claim was not ripe, due to the plaintiff's failure to exhaust administrative remedies by appeal to the Army Board for Correction of Military Records.); *Dzialo v. United States,* 230 Ct.Cl. 506, 510–12, 677 F.2d 873, 875–76 (1982) (military disability claim was premature since plaintiff had not exhausted his administrative remedies); *Rose ·v. United States,* 35 Fed.Cl. 510, 514–15·(1996) (exhaustion is necessary to bring a disability retirement claim to court); *Cook v. United States,* 32 Fed.Cl. 783, 786 and 786 n. 4, *reh'g denied* (1995) ("Claims for disability retirement pay can be brought after the service member retires or is discharged."). Also in *Cook,* in an Order on Reconsideration, the court wrote, "Before this court has jurisdiction over plaintiff's claim for disability retirement, plaintiff must seek relief from a competent

---

4. For the impact of a VA disability rating on the service rating, *see Heisig v. United States,* 719 F.2d 1153, 1157 (Fed.Cir.1983) ("[T]he fact of a 40 percent disability rating under the Veterans Administration's standards did not mandate a similar finding under service standards, but was

evidence to be, and which was, considered along with all other evidence."); *Black v. United States,* 28 Fed.Cl. 177, 184 (1993) ("At the outset, the court notes that the VA's rating is not conclusive."), *aff'd,* 16 F.3d 421 (1993) (table).

board and then, if denied, must file a complaint in this court within six years of the denial." *Cook v. United States*, 32 Fed.Cl. at 787.

Plaintiff contends that, "[w]here it is obvious a disability retirement should have been granted, the Court will grant such a hearing ab initio. . . ." Plaintiff's case citations for this proposition are unconvincing and inapposite. For example, plaintiff cites *Friedman v. United States*, but the plaintiff in *Friedman*, unlike the plaintiff in this case, sought relief on his disability claim from an Army Retiring Board prior to his discharge, and his widow also sought relief from the Army Board for Correction of Military Records. *Friedman v. United States*, 159 Ct.Cl. at 4–5, 310 F.2d at 383–84. Plaintiff also cites *Lemly v. United States*, but the plaintiff in that case, again unlike Mr. Scarseth, "did everything possible to bring it [his disability claim] before the Navy medical authorities as well as the Secretary of the Navy," including one application to the Secretary of the Navy, denied by the Surgeon General of the Navy, a second application to the Secretary of the Navy, denied by the Chief of Naval Personnel, and a request for reconsideration to the Bureau of Naval Personnel, also denied. *Lemly v. United States*, 109 Ct.Cl. 760, 766, 75 F.Supp. 248, 251–52 (1948).

Plaintiff next cites *Cook v. United States* for the proposition that "appeal to the ABCMR is permissive, not mandatory, and a plaintiff that [sic] has not had a PEB could elect to proceed initially in this Court." In *Cook*, however, the court was addressing an unlawful discharge claim when it correctly stated that, "resort to a military corrections board is a permissive, not mandatory, step . . . ." *Cook v. United States*, 32 Fed.Cl. at 786. The court in *Cook* also noted that the plaintiff's complaint did not contain a disability claim, but that a disability claim requires exhaustion of administrative remedies, and the plaintiff had not brought a disability claim before a military board prior to filing the complaint in the Court of Federal Claims. *Id.* at 786 & n. 4.

Plaintiff further contends that, "where a screening Medical Evaluation Board has been denied or the service member had oth-erwise been denied a PEB despite obvious cause, this Court or the Boards for Correction have taken jurisdiction to provide a disability hearing." Plaintiff alleges that he was told by medical personnel that, "additional testing and treatment . . . would take a lot of time," and that, therefore, he elected to forego the testing and treatment and return home to his family. Although unclear, plaintiff appears to be suggesting that these alleged events were tantamount to "otherwise be[ing] denied a PEB." Plaintiff cites the case of *Harper v. United States*, but finds no support in that United States Court of Claims opinion. The plaintiff in *Harper* was offered a Retiring Board, which would have considered his disability claim, but declined the Board because he desired a quick discharge from the military to care for his family. *Harper v. United States*, 159 Ct.Cl. 135, 138, 310 F.2d 405, 406–07 & 406 n. 1 (1962), *reh'g denied*, 159 Ct.Cl. 157, 312 F.2d 436 (1963). Contrary to plaintiff's reading of the case, the Court of Claims in *Harper* determined that plaintiff's disability claim had not accrued at the time he desired a quick discharge from the military for family reasons. Therefore, the plaintiff in *Harper* could not have sought judicial review after declining the Retiring Board offered to him by the Navy. In fact, the plaintiff in *Harper* obtained legal review of his disability claim only after he had first applied to the Navy Correction Board and his application had been denied. *Id.*, 159 Ct.Cl. at 138–39, 310 F.2d at 406–07. Under the ruling in *Harper*, the disability claim of the plaintiff in this case did not accrue when he allegedly elected to forego additional, time consuming, medical testing and treatment and return home to his family. Plaintiff in the present case has not availed himself of the Correction Board, as did the plaintiff in *Harper*. *Accord Grubin v. United States*, 166 Ct.Cl. 272, 276–78, 333 F.2d 861, 862–63 (1964), *judgment entered*, 167 Ct.Cl. 890, 1964 WL 1606 (1964).

Finally, plaintiff alleges in his brief that he "was actually being referred to an MEB for depression and respiratory problems while hospitalized at Eisenhower Army Medical Center," but was "disqualified" as a result of his resignation in lieu of court-martial. De-

fendant explains, in response, that Army regulations prohibit a service member from being processed for a disability claim while under court-martial charges. Similarly, in *Moyer v. United States,* Captain Moyer had court-martial charges filed against him by the Army, and, like Captain Scarseth, submitted his resignation for the good of the service, *Moyer v. United States,* 41 Fed.Cl. 324, 325 (1998), *aff'd,* 190 F.3d 1314 (Fed.Cir. 1999). Captain Moyer was discharged from the Army before his disability processing was complete. *Id.* at 327. The court in *Moyer* noted that "Army Regulation 635–40 expressly provides: 'a soldier charged with an offense under the UCMJ [Uniform Code of Military Justice] . . . may not be referred for, or continue disability processing . . . .'" *Id.* at 327 n. 1. *See also Moyer v. United States,* 190 F.3d 1314, 1321 (Fed.Cir.1999) ("We agree with the Court of Federal Claims that Moyer was not 'administratively separated' because his resignation was tendered in order to avoid trial on charges under the UCMJ by court-martial, and the relevant regulation expressly precludes continued disability processing for soldiers charged under the UCMJ.")

Plaintiff Scarseth has not had his disability claim considered by the "first competent board," and, therefore, does not have a disability claim ripe for judicial review in this court. Plaintiff's disability claim is dismissed, without prejudice, for failure to state a claim upon which relief can be granted.

### Motion for Judgment on the Administrative Record

Alternatively, the defendant has submitted a motion for judgment on the administrative record. For purposes of completeness, and to fully explain the rejection of the plaintiff's claims to him, the court also will address plaintiff's claims that various procedural violations amount to harmful error because they constitute arbitrary or capricious action by the Army.

The applicable standard of review for adverse military actions is whether the adverse decision was arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to law, regulation or man-

datory published procedure of a substantive nature, as a result of which a plaintiff has been seriously prejudiced. *See Sanders v. United States,* 219 Ct.Cl. 285, 298, 594 F.2d 804, 811 (1979); *see also Chappell v. Wallace,* 462 U.S. 296, 303, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (citing *Grieg v. United States,* 226 Ct.Cl. 258, 640 F.2d 1261 (1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982) and *Sanders* ); *Porter v. United States,* 163 F.3d 1304, 1312 (Fed.Cir.1998), *reh'g denied* and *en banc suggestion declined* (1999), *cert. denied,* 528 U.S. 809, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999); *Doe v. United States,* 132 F.3d 1430, 1434 (Fed.Cir.1997); *Wronke v. Marsh,* 787 F.2d 1569, 1571–72, 1576 (Fed.Cir.1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986); *Cole v. United States,* 231 Ct.Cl. 702, 704, 689 F.2d 1040, 1041 (1982) ("The [Service] Secretary can exercise discretion to accept [a resignation] or not, and allow the withdrawal [of the resignation] or not, and his decision will be sustained if not arbitrary and capricious and contrary to law."); *Kinney v. United States,* 51 Fed.Cl. 126, 129 (2001); *Cameron v. United States,* 34 Fed.Cl. 422, 426–27, 433–34 (1995) (arbitrary or capricious standard applied to the decision of the discharge authority, an Air Force general officer, approving the recommendation of an administrative discharge board for a service member's involuntary separation under other than honorable conditions); *Dougharty v. United States,* 27 Fed.Cl. 436, 438–39 (1993), *aff'd,* 11 F.3d 1073 (Fed.Cir.1993) (table), *cert. denied,* 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994) (arbitrary or capricious standard applied to decision by the discharge authority, an Army colonel, to disapprove an administrative discharge board's recommendation for rehabilitation, and to involuntarily discharge a service member with a general discharge); *Wyatt v. United States,* 23 Cl.Ct. 314, 315, 318–20 (1991) (the arbitrary or capricious standard of judicial review applicable to the decision of a discharge review board or a records correction board applies to an Army battalion commander's decision to involuntarily discharge a service member with a general discharge).

As discussed above, the Army CID investigation report concluded that Captain Scarseth had submitted fraudulent travel vouchers, forged rent receipts, and asked his landlord to change his statement to Army investigators. Recoupment action for the overpayments was made by allotment from Captain Scarseth's military paychecks. Court-martial charges were preferred against Captain Scarseth by his commander. Captain Scarseth submitted a resignation in lieu of court-martial dated February 1, 1994 and another resignation dated February 25, 1994. On April 1, 1994, Captain Arnold, government trial counsel, recommended approval of the plaintiff's resignation in lieu of court-martial, and the resignation was forwarded, through the Staff Judge Advocate of the United States Army Garrison, Fort McPherson, Georgia, to the GCMCA for review. On May 16, 1994, the GCMCA recommended approval of plaintiff's resignation, with a discharge, UOTHC. The GCMCA also stayed further disciplinary proceedings, pending the processing of plaintiff's resignation. The resignation then was processed through the Army's Ad Hoc Review Board to an Army Deputy Assistant Secretary for final decision.

Army Regulation 635–120, dated June 1, 1989, as amended, provides at paragraph 5–2c, that data accompanying a resignation in lieu of court-martial will include a copy of the court-martial charges; a copy of reports of investigation; statements and/or documentary evidence which should be considered when determining whether the resignation should be accepted; "[w]hen applicable, an explanation of any abnormal delay from date of offense to date of completion of investigation and submission of resignation"; and "[a] psychiatric evaluation if any reasonable grounds exist to indicate that the officer is, or was at the time of his or her misconduct, mentally defective, deranged, or abnormal."

As noted earlier, in an undated letter by plaintiff to Captain Govern, which Captain Govern responded to on January 4, 1994, plaintiff told his counsel of his "desire to resign my commission." The parties also have stipulated that plaintiff submitted a resignation, dated February 1, 1994, to Captain Govern, which, however, has not been found by the parties. The parties have further stipulated that plaintiff executed another letter of resignation after arriving at Fort McPherson, Georgia. An unsigned copy of this resignation, dated February 25, 1994, is contained in the administrative record. This letter of resignation recites that plaintiff has been "afforded an opportunity to present matters in explanation, mitigation, or defense of my case and such matters are attached." However, the parties stipulated that they have been unable to find documents that were attached to the resignation dated February 25, 1994. The resignation also recites that the resignation letter was submitted voluntarily, after consultation with his counsel, Captain Govern; that the resignation, if accepted, may result in a discharge UOTHC; and that the resignation may be withdrawn only with the approval of Headquarters, Department of the Army. Plaintiff's resignation dated February 25, 1994 appears to conform with Army Regulation 635–120, Figure 5–1, dated June 1, 1989, as amended.

The Army Ad Hoc Review Board assigned to review plaintiff's resignation documents was composed of three colonels and two lieutenant colonels. Although the administrative record does not reflect whether or not the charge sheet, CID investigation, or other materials were provided to the Ad Hoc Review Board or the Deputy Assistant Secretary for review, the Ad Hoc Review Board undertook to review plaintiff's request for discharge. Three members of the Ad Hoc Review Board voted to recommend acceptance of plaintiff's resignation, with a discharge UOTHC, and two members recommended that plaintiff's resignation not be accepted, so as to resume the court-martial process. The documents contained in the administrative record associated with the Ad Hoc Review Board do not mention plaintiff's request to withdraw his resignation.

The recommendation of the Ad Hoc Review Board to accept plaintiff's resignation was forwarded to the Office of the Assistant Secretary of the Army for decision. John W. Matthews, a Deputy Assistant Secretary of the Army for Review Boards and Equal Employment Opportunity Compliance and

Complaints Review addressed both plaintiff's resignation and request to withdraw his resignation. In a June 17, 1994 letter, the Deputy Assistant Secretary disapproved plaintiff's request to withdraw his resignation, and approved the recommendation of the Army Ad Hoc Review Board, that plaintiff's resignation for the good of the service be accepted, with a discharge UOTHC. Plaintiff was discharged on July 27, 1994. Other than the resignation and request to withdraw the resignation, the administrative record does not reflect what other materials may have been reviewed by the Deputy Assistant Secretary.

Plaintiff retained civilian counsel, Reid Kennedy, in April, 1994. Mr. Kennedy assisted plaintiff in preparing a request to withdraw his resignation in a memorandum dated April 21, 1994. Plaintiff stated in his request to withdraw his resignation that in spite of the language in his resignation indicating he had been "afforded an opportunity to present matters in explanation, mitigation, or defense of my case and such matters are attached," no matters in explanation, mitigation or defense were included with his resignation. Plaintiff further stated in his request to withdraw his resignation that: "Unfortunately, sufficient time does not remain for me to copy and include my extensive documentation as an attachment."

Plaintiff also stated in his request to withdraw his resignation that he was overwhelmed with his assigned military tasks, worked with little or no assistance, prepared his pay vouchers to the best of his ability and did not intend to claim pay to which he was not entitled. He acknowledged signing his landlord's name to rent receipts, but denied that it constituted forgery, and further denied that he had attempted to influence his landlord's statement to investigators. He also raised his mental condition in this context: "I do not contend that my condition raises to a defense against criminal charges. However, this condition is certainly material and relevant for consideration when the ultimate decision regarding the character of my discharge is determined." Plaintiff also indi-

cated that he was not satisfied with his military counsel. As noted above, the Deputy Assistant Secretary disapproved plaintiff's request to withdraw his resignation, and approved the recommendation of the Army Ad Hoc Review Board, that plaintiff's resignation for the Good of the Service be accepted, with a discharge UOTHC.

Plaintiff subsequently submitted to the Army Discharge Review Board (ADRB) an "Application for the Review of Discharge or Dismissal from the Armed Forces of the United States," dated July 25, 1995. The parties have stipulated that plaintiff raised the following issues for consideration of plaintiff's discharge under other than honorable conditions,[5] by the ADRB: whether plaintiff's decision to resign was coerced and involuntary; whether plaintiff received ineffective assistance of counsel; whether plaintiff was given a reasonable amount of time to consider resigning; whether plaintiff should have been given a psychiatric examination; and whether there was an unexplained delay between plaintiff's alleged offense and the preferral of court-martial charges.

The ADRB was composed of five Army colonels, who voted unanimously to deny plaintiff's application after a hearing conducted on May 18, 1998. Plaintiff was represented at the hearing by civilian counsel (the same counsel representing plaintiff in the action before this court). The transcript of the hearing before the ADRB is included in the administrative record filed with this court. According to the record before this court, the ADRB had the following documents before it when it reviewed plaintiff's claims: plaintiff's discharge certificate; application for ADRB review; Deputy Assistant Secretary's decision document on plaintiff; records from the Ad Hoc Review Board, plaintiff's brief submitted to the ADRB with numerous attachments, including plaintiff's awards, OERs, record of medical treatment, request to withdraw resignation, affidavit of civilian counsel and letters of recommendation; the Army CID investigation report, Army orders, memoranda from the finance

5. Pursuant to Army Regulation 635–120, paragraph 5–6a, dated June 1, 1989, as amended, a resignation in lieu of court-martial, for the good of the service, is normally under other than honorable conditions.

office and from plaintiff's commander; plaintiff's cash collection voucher, travel vouchers and payments made on the vouchers and lodging receipts; plaintiff's academic record; plaintiff's checking account records; records of plaintiff's drill attendance; documents related to plaintiff's home of record; and the memorandum releasing military defense counsel.

After the hearing, the ADRB concluded that Captain Scarseth had been "properly and equitably discharged." The Board rejected plaintiff's allegations, noting that:

The evidence of record shows that the applicant was charged with the commission of an offense punishable under the Uniform Code of Military Justice with a punitive discharge. The Board noted that after consulting with legal counsel, the applicant, voluntarily and in writing, requested separation from the Army in lieu of trial by court-martial. The Board was satisfied that all requirements of law and regulation were met and the rights of the applicant were fully protected throughout the separation process. The Board found that the evidence in the applicant's record, including his own statements, factually supported his request. The Board considered the testimony of the applicant as well as the arguments of counsel and determined that the applicant submitted the request to resign for the good of the service voluntarily, even though he was under significant stress; it further noted that despite his current challenge to the effectiveness of his counsel, he wrote a memorandum at the time expressing his appreciation to that counsel. Finally, the Board considered applicant's entire record of service for the period under review as well [sic] the additional information submitted by the [sic] him; it also noted that the characterization for this type of discharge is normally under other than honorable conditions and that the applicant was aware of this prior to requesting discharge. The Board, being convinced that the reasons for discharge and the characterization of service were both proper and equitable, voted to deny relief.

In a letter to plaintiff dated May 22, 1998, the ADRB stated:

after careful consideration and review of your military records and all other available evidence, [the Board] determined that you were properly and equitably discharged. Accordingly, the Secretary of the Army has directed that you be advised that your request for a change in the character and/or reason of your discharge has been denied.

The ADRB and the other Service Discharge Review Boards are defined by statute:

(a) The Secretary concerned shall ... establish a board of review, consisting of five members, to review the discharge or dismissal ... of any former member of an armed force under the jurisdiction of his department upon its own motion or upon the request of the former member ....

(b) A board established under this section may, subject to review by the Secretary concerned, change a discharge or dismissal, or issue a new discharge, to reflect its findings.

(c) A review by a board established under this section shall be based on the records of the armed forces concerned and such other evidence as may be presented to the board. A witness may present evidence to the board in person or by affidavit. A person who requests a review under this section may appear before the board in person or by counsel or an accredited representative of an organization recognized by the Secretary of Veterans Affairs ....

10 U.S.C. § 1553 (1994).

The ADRB does not have the authority to order plaintiff's reinstatement.[6] Howev-

---

6. *See Longhine v. United States*, 230 Ct.Cl. 920, 922, 1982 WL 25276, at *1 (1982) ("[T]he ADRB action requested and received an upgraded discharge (which is all that the ADRB is empowered to do, 10 U.S.C. § 1553(b) (1976) ....")); *Guerra v. Scruggs*, 942 F.2d 270, 272 (4th Cir.1991) ("The ADRB has authority to change a discharge or to issue a new discharge, but it does not have authority to reverse or vacate a discharge."); *Smith v. Marsh*, 787 F.2d 510, 511 n. 1 (10th Cir.1986) (The ADRB is empowered "to review and change, if warranted, the character of a discharge and/or the reason for a discharge."); *Chilcott v. Orr*, 747 F.2d 29, 31–32 (1st Cir.1984)

er, the ADRB possessed the authority, subject to the review of the Secretary of the Army, to determine the propriety of the reason for plaintiff's discharge (resignation in lieu of court-martial, or as plaintiff requested, discharge for the "Convenience of [the] Government") and also to determine the appropriateness of the character of plaintiff's discharge (the discharge UOTHC, or as plaintiff requested, an "Honorable" discharge). The ADRB found plaintiff's resignation in lieu of court-martial to have been voluntary and that in lieu of court-martial was the appropriate reason for his separation from the Army, UOTHC. As noted above, the ADRB is established by the Secretary of the Army and its findings are subject to review by the Secretary. In plaintiff Scarseth's case, the Office of the Secretary adopted the findings of the ADRB.

Substantial evidence supported the ADRB's conclusions on the issues submitted for review to the Board by plaintiff. The ADRB noted that plaintiff was charged with the commission of an offense punishable under the Uniform Code of Military Justice with a punitive discharge. The Army's criminal investigation report, which was before the Board, indicated that the alleged offenses occurred in December, 1990 and between July and October, 1991, were reported to investigators in March, 1992, and the investigation concluded in June, 1992. At the conclusion of the Army CID investigation, the finance office and plaintiff discussed the amount of the overpayments and recoupment action to recover the amount due the government. The finance office began to collect plaintiff's indebtedness in December, 1992 by monthly allotments from plaintiff's military paychecks. Plaintiff had not completed repayment when criminal charges were preferred on December 11, 1993. In a February 1, 1994 memorandum to his military counsel, plaintiff indicated that he enclosed his resignation, dated the same day. The parties have stipulated that plaintiff executed another letter of resignation, dated February 25, 1994, an unsigned copy of which is in the record. In terms of the time line of the alleged offenses, investigation and resignation, the record before the ADRB reflects that the Army completed a timely CID investigation once notified of the alleged offenses. After the CID investigation, the government began recouping the overpayments to plaintiff. Recoupment action continued by monthly allotment throughout 1993, and had not been completed when the criminal charges against plaintiff were preferred by his commander in December, 1993. The resignation in lieu of court-martial was submitted by plaintiff within three months of the preferral of charges.

As noted above, the Army's criminal investigation was before the ADRB. The investigation report alleged that plaintiff "prepared and submitted numerous fraudulent travel vouchers," and contained a sworn statement from plaintiff's landlord, Felix Gardner, stating that plaintiff had "pleaded for me to change my statements" to the Army investigators, but that Mr. Gardner "would not lie" for plaintiff. When the Board inquired about this sworn statement, plaintiff indicated that Mr. Gardner was lying. Army investigators also had asked plaintiff, "Where did the other [rent] receipts you submitted signed by Felix Gardner come from?" Plaintiff replied, under oath, that "I filled those out myself and signed them." Mr. Gardner stated under oath that he never gave plaintiff a rent receipt, but did sign one blank sheet of paper given to him by plaintiff. Plaintiff told the ADRB that: "The first receipt I submitted, he did sign. We—you know, I typed it out. He looked it over. He signed it. I submitted it." Plaintiff was asked by the ADRB how many rent receipts he signed for Mr. Gardner. Plaintiff stated, "I think it was three." The investigation report before the ADRB contained six rent receipts with "Felix Gardner's" name signed at the bottom. Plaintiff acknowledged to the ADRB that he was living with Mr. Gardner in Tallahassee, Florida, but claimed as his true home of record other locations, which entitled him to

(The Air Force Discharge Review Board "has the authority to change the discharge or to issue a new discharge according to its findings, although it cannot revoke a discharge.... The Secretary of the Air Force may review the board's decisions, but must make his own written findings and conclusions, unless those of the board are adopted.").

additional pay due to being more than fifty miles away from his duty station and residence in Tallahassee, Florida. The ADRB knew that the plaintiff was reimbursing the government for the overpayments made to him, and ultimately did fully reimburse the government. Substantial evidence before the ADRB indicated plaintiff's exposure to criminal charges. The Army criminal investigation report, which provided an indication of what plaintiff potentially would have to defend against in a court-martial also provided support for his military counsel's advice to plaintiff to submit a resignation in lieu of court-martial. The evidence before the ADRB of the criminal investigation, together with documentation, and the potential court-martial served as legitimate and reasonable motivation, not resulting from coercion, for plaintiff to voluntarily submit his resignation.

The record before the Board contained a February 1, 1994 memorandum in which plaintiff thanked Captain Govern for the latter's inquiry as to what course of action plaintiff had decided to take, and for his military attorney's "on-going assistance in this matter." In reviewing the February 1, 1994 memorandum, one Board member, Colonel Miller, noted that Captain Scarseth had told the Board he felt pressure from Captain Govern to submit a resignation, but actually was not in Captain Govern's presence at the time he drafted the February 1, 1994 memorandum, with the enclosed February 1, 1994 resignation. At the hearing before the ADRB, Colonel Miller stated: "You [plaintiff] had had time to reflect on what you all [you and your attorney] had discussed. You decided, after reflecting on discussions, to resign. You submitted the resignation memo to him [Captain Govern] and you thank [sic] him for all his assistance, which is contrary to what you've been telling us all morning." Colonel Miller also asked plaintiff, "You know your defense counsel captain, and he had a boss. Did you ever consider going to his boss and saying, 'Look. I'm not getting the right kind of representation?'" Plaintiff indicated that the thought crossed his mind, but he "was not able to muster it up and demand to see his [Captain Govern's] boss." Plaintiff acknowledged that he knew he could retain different military or civilian

counsel, and, in fact, ultimately did take action to change attorneys. The ADRB noted the criminal charges preferred against plaintiff and by rejecting all of plaintiff's claims concluded that the criminal charges preferred against plaintiff provided a reasonable basis for counsel's advice to submit a resignation rather than potentially face a court-martial on serious charges.

The ADRB also explored whether plaintiff was "so depressed, so under stress, so much suffering from PTSD that [he was] unable to assist in [his] own defense?" Plaintiff's request to withdraw his resignation, which was before the ADRB and was prepared with the assistance of civilian counsel, indicated that:

10. The entire time this matter was being discussed, I was under the care of Dr. Gary Cabbage of the Ft. McPherson health clinic. He and two other psychologists have diagnosed my mental condition and all agree that I am suffering from a post-traumatic stress disorder.... I do not contend that my condition raises to a defense against criminal charges. However, this condition is certainly material and relevant for consideration when the ultimate decision regarding the character of my discharge is determined.

Plaintiff resigned in March of 1994, and was released from the service on July 27, 1994. In support of his ADRB application, plaintiff submitted to the ADRB a letter, dated May 13, 1998, which he had requested from Ernest Boswell, Ph.D., a psychologist who examined plaintiff in Minnesota after his discharge, approximately six months after plaintiff had submitted his second resignation, dated February 25, 1994. Dr. Boswell indicated that plaintiff had been referred to him by Gary Cabbage, of the Georgia Vet Center. Mr. Cabbage had requested "an assessment for possible Posttraumatic Stress Disorder (PTSD)." Dr. Boswell indicated in his letter that "[a] full psychological assessment ... was conducted from 9/12/94 through 10/11/94." He did not conclude in his letter that plaintiff was suffering from PTSD. According to Dr. Boswell, plaintiff's "level of psychological functioning is quite likely compromised when he is under periods of stress," and also that his [Dr. Boswell's]

"current assessment found no evidence of a personality disorder of sociopathic or psychopathic tendencies." The record before the Board also contained Gary Cabbage's annotation in plaintiff's medical records that plaintiff's chief complaint was "anxiety."

The Board, therefore had the benefit of the above medical inputs, as well as the criminal investigation report, testimony at the ADRB hearing and other materials described above not available to Dr. Boswell or Mr. Cabbage. However, even Dr. Boswell's examination, six months after the fact, does not command a conclusion by the Board that plaintiff was mentally defective, deranged or abnormal when he submitted his resignation in lieu of court-martial. The Board noted that plaintiff was "under significant stress," which is consistent with the medical inputs submitted to the ADRB by plaintiff. The record before the Board reflected that plaintiff was capable of and had provided documents, analysis and assistance to both his military and civilian counsel. As summarized above, substantial evidence supported the ADRB's rejection of the plaintiff's contentions before the Board, upholding the propriety of plaintiff's discharge UOTHC based on plaintiff's resignation in lieu of court-martial.

Plaintiff also argues that the Army committed errors in the processing of his resignation in lieu of court-martial at the Ad Hoc Review Board. Plaintiff first notes a statement on a one-page form which contains a summary of information about plaintiff. The form, which is in the record, contains information on plaintiff, such as his age, marital status, unit of assignment, etc., and also contains a short, "brief of facts," which notes that plaintiff submitted his resignation, that he was charged with larceny and false travel claims, that the chain of command recommends approval of his resignation with a UOTHC, and then erroneously notes on Captain Scarseth's form, that a "CPT Jones is a reservist who was called to active duty for purpose of court-martial action." Captain Scarseth alleges that there was a "CPT Jones" in plaintiff's unit, who was "facing much more severe charges with far less grounds for mitigation" than plaintiff. Plaintiff describes this error as "an indication of exceptional and extremely prejudicial administrative irregularity."

However, other than plaintiff's speculation, there is no evidence that the Ad Hoc Review Board reviewed a CPT Jones' records rather than plaintiff's to arrive at its conclusions regarding Captain Scarseth's resignation. The summary of information form with the error on it clearly has Captain Scarseth's name at the top of the form, and twice more in the "brief of facts" portion, right above the "CPT Jones" reference. The Ad Hoc Review Board's "routing slip" contains the hand written notation of a the Presiding Officer of the Board, listing Captain Scarseth's offenses (fraud, forgery) rather than the alleged offenses of a "CPT Jones," according to plaintiff's allegation (an individual "convicted of the theft of thousands of dollars of Army supplies"). Furthermore, the voting record of the Ad Hoc Review Board contains Captain Scarseth's name, not CPT Jones', and all five Board members indicated their vote on Captain Scarseth beside their typed names on the voting record. Plaintiff's assertion of a nexus between this error and an adverse Board evaluation of plaintiff is mere speculation. Furthermore, as noted above, substantial evidence supports the conclusion that the Ad Hoc Review Board reviewed plaintiff's resignation, and not that of another individual.

Plaintiff next notes that the ADRB's chronology of dates and events in this case states that, on June 7, 1994, the Ad Hoc Review Board recommended approval of plaintiff's resignation, with an other than honorable conditions discharge. The Ad Hoc Review Board's routing slip contains a notation that the case was received on June 7, 1994 and a hand written comment by the Presiding Officer, dated June 14, 1994. Plaintiff concludes, "this establishes that review by board members took place on different dates by circulation or other means and is evidence that the Board never actually met together, as boards are supposed to do." Although, in any event not determinative in plaintiff's favor, it is possible that the ADRB simply did not notice the hand written June 14, 1994 date by the Presiding Officer at the bottom of the page, but did note the typed June 7, 1994 date at

the top of the page on the routing slip and used that date in its chronology. In any case, the two dates are not evidence that plaintiff's resignation was circulated among Board members, as plaintiff claims. Even if plaintiff's resignation had been circulated among Board members, plaintiff has cited no case or other authority, nor provided any reasoning that such a practice constitutes prejudicial error. As noted above, the voting record of the Ad Hoc Review Board contains the typed names and signatures of the five Board members, clearly indicating their vote on Captain Scarseth's resignation.

Finally, plaintiff notes that the date of the letter forwarding the Ad Hoc Review Board's recommendation to the Office of the Assistant Secretary of the Army for decision is dated May 19, 1994, but, the Ad Hoc Review Board's own routing slip, noted above, indicates that plaintiff's resignation was received by the Ad Hoc Review Board on June 7, 1994 and bears a comment from the Presiding Officer dated June 14, 1994. Plaintiff concludes that the Army Personnel Command cover letter to the Office of the Assistant Secretary, dated May 19, 1994, therefore, must have been forwarded to the Secretarial level on May 19, 1994, even before the Ad Hoc Review Board received plaintiff's resignation on June 7, 1994. As noted above, however, the record also contains a one-page form which contains a summary of information about plaintiff. That form is dated May 19, 1994. The date on the Army Personnel Command's cover letter is May 19, 1994. It is possible that the date was copied from the one document to the other. The Personnel Command's cover sheet reflects that the two enclosures, a "Work Sheet," and plaintiff's "Resignation," were forwarded to the Office of the Assistant Secretary. The Ad Hoc Review Board documents in the record clearly indicate that the Board was reviewing plaintiff's resignation after June 7, 1994. Therefore, plaintiff's resignation had not been forwarded to the Secretary on May 19, 1994. The May 19, 1994 date on the cover letter appears to be in error.

The parties have stipulated that the General Court–Martial Convening Authority forwarded plaintiff's resignation for review on May 16, 1994 and the Deputy Assistant Secretary made his decision on plaintiff's resignation on June 17, 1994. The Ad Hoc Review Board received, acted on and forwarded plaintiff's resignation between those two dates. Although the documents in the record before the Ad Hoc Review Board demonstrate carelessness, plaintiff has not indicated any nexus between the errors and the adverse Board evaluation and recommendation on plaintiff's resignation. Furthermore, substantial evidence supports the regularity of the review process and the conclusions of the Ad Hoc Review Board. Harmful error must amount to "material factual errors and prejudicial injustices." *See Sanders v. United States*, 219 Ct.Cl. at 307, 594 F.2d at 816. "[M]ere technical errors will not merit a reversal of the Board's decision." *Weaver v. United States*, 46 Fed.Cl. 69, 77 (2000). As discussed above, the errors identified by plaintiff constitute technical errors.

Plaintiff also complains that decision makers did not consider all of the documents or evidence they should have considered. For example, the Army Deputy Assistant Secretary, who took final action in plaintiff's case, addressed both the resignation and request to withdraw the resignation, but the Ad Hoc Review Board documents do not mention the request to withdraw the resignation, and the administrative record contains no Ad Hoc Review Board recommendation for approval or disapproval of the request to withdraw the resignation. *See* Army Regulation 635–120, paragraph 2–4a, dated June 1, 1989, as amended. The copy of plaintiff's resignation in the record, dated February 25, 1994, recites that matters in explanation and mitigation were attached to the resignation, but no such matters have been found and placed in the administrative record, and plaintiff alleges that no such matters were actually attached, regardless of the statement to the contrary in the resignation. Plaintiff also notes that resignations require a psychiatric evaluation, "if any reasonable grounds exist to indicate that the officer is, or was at the time of his or her misconduct, mentally defective, deranged, or abnormal," but no evaluation was performed. Army Regulation 635–120, paragraph 5–2c(5), dated June 1, 1989, as amended.

Army Regulation 635–120 further provides, at paragraph 5–2c, that data accompanying a resignation in lieu of trial will include a copy of the court-martial charges; a copy of the report of investigation; statements and/or documentary evidence; and, "when applicable, an explanation of any abnormal delay from date of offense to date of completion of investigation and submission of resignation." Army Regulation 635–120, paragraph 5–2c, dated June 1, 1989, as amended. From the record provided to this court, it is clear that these documents were before the ADRB, even though it is not clear from the record whether or not these materials accompanied the resignation package through the review process.

■ The general rule in military pay matters is that, "to prevail, a plaintiff must 'overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith.'" *Doe v. United States*, 132 F.3d 1430, 1434 (Fed.Cir.1997) (quoting *Sanders v. United States*, 219 Ct.Cl. at 302, 594 F.2d at 813). In addition to overcoming the rebuttable presumption in favor of the regularity of the action taken by military officials, the United States Court of Claims stated in *Sanders* that, "[s]trong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters," and also stated that the court will not substitute its judgment for the military decision makers, "when reasonable minds could reach differing conclusions." *Sanders v. United States*, 219 Ct.Cl. at 302, 594 F.2d at 813–14.

■ It may be that a substantially complete record was reviewed by Army decision makers, but the administrative record before the court is not clear as to whether or not, although provided to the ADRB, pertinent documents were provided to decision makers, prior to the ADRB's review. *Sanders v. United States*, 219 Ct.Cl. at 302, 594 F.2d at 814. Plaintiff shares responsibility for this state of affairs. Plaintiff had the opportunity to provide matters in explanation and mitigation when he submitted his request to withdraw his earlier resignation. Although plaintiff now contends that his resignation did not contain such matters in explanation and mitigation, he submitted his request for withdrawal of the resignation, assisted by civilian counsel, without documentation. The request to withdraw his resignation itself states that: "Unfortunately, sufficient time does not remain for me to copy and include my extensive documentation as an attachment." The court concludes that plaintiff had the opportunity to provide materials, failed to provide the materials or to request an extension of time in order to provide the materials, although the plaintiff cites the omission of the same materials from the review process as error. As noted earlier, the materials in question, however, were provided by plaintiff to the ADRB for their review, and are contained in the administrative record before the court.

The subsequent review by the ADRB of the plaintiff's discharge and resignation resulted in harmless error on the government's part, for any deficiencies that may be attributable to the government during the earlier review process. The United States Court of Appeals for the Federal Circuit in *Porter v. United States* reviewed the harmless error rule, surveying various United States Court of Claims cases which shaped that court's definition of the rule. Relying on and reviewing *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979), the Federal Circuit noted language in *Sanders* that the "burden of proof falls on the plaintiff to demonstrate an 'abuse of administrative discretion [that] rises to the level of legal error which merits judicial relief.' . . . Harmless error, according the court, lies when 'substantial evidence shows that it was unlikely that the officer [in *Sanders* ] would have been promoted in any event.' Because the burden to produce such substantial evidence is on the government, and because 'that evidence is missing here,' Sanders was entitled to prevail." *Porter v. United States*, 163 F.3d 1304, 1316–17 (Fed. Cir.1998), *cert. denied*, 528 U.S. 809, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999) (quoting *Sanders v. United States*, 219 Ct.Cl. at 302, 310, 594 F.2d at 813, 818). Quoting from *Hary v. United States*, 223 Ct.Cl. 10, 618 F.2d 704 (1980), the court in *Porter* noted,

"the claimant must show that the alleged defect in the proceedings [two faulty OERs] 'substantially affected the decision to separate him ... it is quite likely that the plaintiff would have failed to be promoted to permanent major in 1971 and 1972 even if the [defective] OERs had not been in his record.' In short, after assessing the government's rebuttal to the officer's prima facie case, the error of the two OERs was held to be harmless." *Porter v. United States,* 163 F.3d at 1318 (quoting *Hary v. United States,* 223 Ct.Cl. 10, 15, 24, 618 F.2d 704, 707, 711 (1980)). The court in *Porter* also reviewed the decision in *Engels v. United States,* 230 Ct.Cl. 465, 678 F.2d 173 (1982), and noted the following language, "[t]he court restated the rule to clarify that the burden on the officer is to make a prima facie showing of nexus between the alleged error in his record and the [adverse] decision. The final burden of persuasion 'falls to the Government to show harmlessness—that, despite the plaintiff's prima facie case, there was no substantial nexus or connection.'" *Porter v. United States,* 163 F.3d at 1318 (citing *Engels v. United States,* 230 Ct.Cl. 465, 468, 678 F.2d 173, 175 (1982), *opinion supplemented,* 2 Cl. Ct. 166 (1983)).

The alleged errors attributable to the government are harmless. Both the resignation in lieu of court-martial and plaintiff's request to withdraw his resignation were before the ADRB, with a complete record. The matters in explanation and mitigation, which plaintiff alleges were not attached to the resignation, and which plaintiff admittedly failed to attach to his request to withdraw his resignation, ultimately were provided to the ADRB for review. Plaintiff was represented by civilian counsel at the ADRB and counsel filed papers on plaintiff's behalf. Plaintiff also testified extensively before the ADRB. Plaintiff had the opportunity to provide to the ADRB, and did provide both medical records and an input from a licensed clinical psychologist, Dr. Ernest Boswell, to address plaintiff's assertions of mental incapacity. In his April 21, 1994 withdrawal of resignation, plaintiff also stated that he was not claiming mental incapacity as a defense against the court-martial criminal charges, but as a consideration on whether he should

receive an honorable discharge from the Army, or a discharge UOTHC. Plaintiff's assertions were rejected by the ADRB, with the Board distinguishing between an officer under stress, facing court-martial charges and trying to decide whether or not to resign, and an officer who is mentally deranged or mentally defective. Substantial evidence before the ADRB, in documentation provided and in plaintiff's testimony, supports the Army decision that an Army Regulation 635–120 "psychiatric evaluation" was not required to be included in plaintiff's resignation package and that plaintiff was not mentally incapacitated. Plaintiff, nevertheless, was afforded the opportunity to provide input on his mental capacity, and did so. Plaintiff also had the opportunity before the ADRB to discuss the time line of his case and any prejudice stemming from possible unexplained delay from the dates of alleged offenses to completion of the Army's criminal investigation and plaintiff's submission of his resignation. Once notified, the Army conducted a timely criminal investigation. The finance office took recoupment action after the criminal investigation closed. Plaintiff established a monthly allotment, and ultimately repaid the indebtedness over time, although not by the deadline. After the criminal charges were preferred, plaintiff took two months to submit his first resignation in lieu of court-martial and another month before submitting his second resignation. As discussed above, substantial evidence supported the ADRB's finding that the plaintiff's resignation in lieu of court-martial was not involuntary or coerced. Throughout, plaintiff had the assistance of counsel. The record reflects that the ADRB, and the Secretary of the Army in adopting the findings of the ADRB, did not act arbitrary or capriciously. Substantial evidence supported the decision of the ADRB and the Office of the Secretary, rendering the errors attributed to the government by the plaintiff harmless.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is, hereby, **GRANTED,** and plaintiff's complaint is dismissed, with prejudice, with the exception of plaintiff's disabili-

ty claims which are **DISMISSED,** without prejudice, to afford the plaintiff the opportunity, if desired, to seek administrative review of his disability claims. Alternatively, defendant's motion for judgment on the administrative record is **GRANTED.** The Clerk's Office shall enter judgment consistent with this opinion.

**IT IS SO ORDERED.**